[No. A105198. First Dist., Div. Two. June 15, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND HOUSTON, Defendant and Appellant.

**COUNSEL**

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Moona Nandi and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LAMBDEN, J.**—Raymond Houston (appellant) appeals his conviction for second degree murder with a weapon of his estranged wife, Lucille Houston (Houston), for which the trial court sentenced him to a term of 40 years to life in prison. Appellant contends that the trial court violated his constitutional rights by admitting into evidence Houston's previous statements to police and hospital personnel about appellant's acts of domestic violence against her; erred in refusing to exclude certain DNA evidence; committed prejudicial error by admitting purportedly improper "bad character" evidence regarding appellant's extramarital affairs; and should have allowed him an evidentiary hearing to develop purported facts of spectator misconduct that supposedly tainted the jury. Appellant contends that his conviction must be reversed and a new trial granted or, in the alternative, that the matter must be remanded for an evidentiary hearing regarding the purported spectator misconduct. For the reasons stated *post*, we affirm appellant's conviction.

## BACKGROUND

I. *Factual Background*

On November 23, 2001, Houston's friends contacted the police and appellant after Houston had failed to pick up an out-of-town visitor at the airport on November 21, 2001, appear with appellant at a friend's house on November 22, 2001, for Thanksgiving dinner, or call her mother on her mother's birthday. Houston, a photojournalist for the San Jose Mercury News, was married to appellant since 1998. In June 2001, she had moved out of their jointly owned house on Fresno Street in Oakland and filed for divorce.

Appellant met with Houston's friends and the police on November 23, 2001. There was testimony that he claimed at that time that Houston had stayed with him overnight at the Fresno Street house on November 20, 2001; that he had moved her car into his garage Tuesday night so she could remove camera equipment to make room for the luggage of her out-of-town visitor;[1] that he had left her at the house early the following morning, November 21, 2001, to go to his workplace in Alameda; that Houston had planned, among other things, to pick up her friend at the airport and later meet him around noon at his workplace to have documents notarized transferring appellant's ownership interest in the Fresno Street house to Houston; that they had planned to attend the Thanksgiving dinner together the next day; and that she did not appear at his workplace and had not contacted him since. Appellant

---

[1] Houston's friend recalled that appellant specifically said he moved Houston's car into the garage on the evening of November 20, 2001, which she found strange because it required appellant to leave his own Mercedes, which he carefully protected, on the street overnight. Appellant later contended that he moved the car into the garage the next morning, and that he never said he did so Tuesday night.

said Houston had told him she was going to pick up her friend at the airport around 9:00 a.m. or 9:30 a.m., a time he later recalled to be 11:00 a.m. or 11:30 a.m. Appellant also claimed that he had tried to attend the Thanksgiving dinner, but could not find the friend's house, although he had been there before and the friend was listed in the phonebook. Appellant said that he had tried to reach Houston by telephone. He allowed police to look through the house, but nothing was found relating to Houston.

Appellant gave a written witness statement to police later in the early morning of November 24, 2001, which was prepared by an interviewing officer and signed by appellant. He recited much of what he had said earlier, stating that he left Houston alive at the Fresno Street house when he left for work between 6:30 and 6:40 a.m. on the morning of November 21, 2001, and that "[i]t is very unlike Lucille to be missing. She has good physical and mental conditions and has never done anything like this before. I have no idea where Lucille could have gone." The interviewing officer testified at trial that appellant did not indicate at the time that anyone else had access to the house.

On November 25, 2001, Lucille Houston's body was found under a blue tarp on the backseat of her car, clad in underpants only, parked on a street within about 15 minutes' walking distance of the Fresno Street house. The pathologist who performed an autopsy testified that Houston was killed by gunshots to her abdomen and head. Police recovered a bullet from Houston's brain, but the bullet that caused the wound to Houston's abdomen had passed through her body and was not found in the car. Police also found an envelope in the backseat pocket of the driver's area containing documents which contemplated appellant's transfer of his interest in the Fresno Street house to Houston.

Police searched the Fresno Street house again after they found Houston's body. An investigator noticed a recently plastered area of one wall about 39 inches off the ground behind a coat rack in appellant's upstairs bedroom. Inside the wall, police found a bullet. An experienced police forensic biologist extracted material from the bullet and found traces of what almost certainly was Houston's DNA; she testified that only one in 635 billion people would be a DNA match. A police firearms expert conducted an extensive analysis of the bullets recovered from Houston's brain and from appellant's bedroom wall and concluded that they were fired from the same gun, a .380 automatic.

Police found other relevant physical evidence in the Fresno Street house. They concluded from their examination of a box spring in appellant's bedroom that a bullet had passed through it, with the "entry" hole approximately 37 inches and "exit" hole about 39 inches above the ground when the

box spring was placed on edge. They also found numerous unidentifiable fingerprints in the house, no blood evidence, cleaning supplies, and a container of joint compound.

The police did not find any of Houston's personal effects at the Fresno Street house. They searched the hotel room where Houston had been staying, and found such things as her toiletries, cosmetics, clothes, and inhaler there.

Appellant was subsequently arrested and, by information filed on May 2, 2002, charged with murdering Houston sometime between November 20 and 25, 2001, in violation of Penal Code section 187, and with using a firearm in violation of Penal Code sections 12022.53, subdivisions (c) and (d), 1203.06, subdivision (a)(1) and 12022.5, subdivision (a)(1). Appellant pled not guilty and denied the enhancements.

## II. *Relevant Pretrial Motions*

Prior to trial, the parties debated several relevant motions regarding evidence, which are addressed further in the discussion section, *post*. First, respondent sought to have admitted, and appellant sought to exclude, Houston's hearsay statements regarding two prior incidents of domestic violence involving appellant. Houston had made statements to the police and hospital personnel that appellant had attacked her on June 22, 2001, in a fight at the Fresno Street house, pulling out some of her hair and injuring her finger, after Houston told him she wanted a divorce because she could not understand why he stayed out all night. Respondent also sought admission, and appellant the exclusion, of Houston's statement to police about an August 2001 incident, in which she stated that appellant had argued with her about the disposition of the Fresno Street house in their divorce and then kicked out her car window. The court allowed all of the evidence to be admitted.

Second, appellant moved to exclude evidence of Houston's DNA that police had extracted from the bullet found in the wall of appellant's bedroom. Appellant contended that the police had "digested" the entire bullet to extract DNA from the bullet, and thereby made it impossible for appellant to determine the reliability of the police's extraction methods. Respondent contended that under the circumstances of their investigation at the time, the police acted appropriately and without any intent to unnecessarily destroy evidence. The court denied appellant's motion.

Third, the parties debated the admissibility of testimony from two witnesses, W.M. and S.P., who each testified at trial that she had had an affair with appellant during appellant's marriage to Houston. Respondent moved to introduce S.P.'s testimony of her dealings with appellant, which at trial

included appellant's promises, before Houston's death, to marry her and, later, to provide financial support for a baby they had conceived together. Respondent contended that this testimony was relevant to show appellant's deceitfulness, arguing that appellant had been stringing S.P. along in the same manner that he had deceived Houston about selling his interest in the house to her. The court granted this motion.

Respondent moved to introduce testimony by W.M. that appellant made comments indicating he was possessive about his house in August of 2001. The court, after cautioning respondent about the possible undue prejudice that could result from extended testimony about appellant's extramarital affairs, granted this motion as well.

Finally, the parties debated whether respondent would be allowed to ask S.P. and W.M. if appellant told them he was married during their affairs. Appellant contended such testimony would be prejudicial, while respondent contended it was relevant to the credibility of both appellant and of S.P. and W.M. The court, agreeing with respondent, allowed the line of questioning.

III. *The Trial of Appellant*

A. *Respondent's Evidence*

Respondent presented the testimony and evidence discussed above. Witnesses also testified about suspicious statements and actions by appellant after Houston's disappearance. For example, appellant did not respond to a telephone message on November 22, 2001, from the hostess of the Thanksgiving dinner expressing concern about Houston's whereabouts; sought the advice of counsel before signing his witness statement for police; did not join in efforts to publicize Houston's disappearance organized by Houston's friends; abruptly volunteered to police that a blue tarp was missing from his backyard while discussing Houston's disappearance with them; and misled a work dispatcher on November 24, 2001, about his whereabouts when told the police were "looking" for him because, a coworker testified, appellant said at the time that he feared arrest.

Respondent also presented evidence which indicated that appellant and Houston had engaged in difficult negotiations regarding the disposition of the Fresno Street house in their divorce. At the time of her disappearance, Houston had been urging appellant for some time to transfer his interest in the house to her so that she could refinance the property and use part of the funds obtained to pay appellant for his interest. A loan officer and escrow assistant testified, and their testimony together was that Houston had qualified for a loan, and had been given an interspousal deed for appellant's signature

in October 2001. Although Houston said that appellant had told her he had sent the deed back to the loan company in October, the company had not received the document, and the loan documents subsequently had expired. A few days before Houston's disappearance, the loan company had sent new documents by overnight delivery to Houston for signing, and made an appointment with Houston to meet at 12:45 p.m. on November 21, 2001, but Houston did not show up. A friend of Houston's testified that Houston told her that appellant would not sign the papers.

Three of appellant's coworkers also testified on respondent's behalf. One coworker testified that a few days after Houston's disappearance, on Saturday, November 24, 2001, appellant told her that he had argued with Houston when she stayed over at his house, and that he previously had torn up a quitclaim deed that he had signed because Houston had been unable to pay him for his interest. Appellant said Houston was supposed to have met him at his workplace to have documents notarized on November 21, 2001, but that he had told Houston "that she might as well not show up if she didn't bring some proof that she had gotten financing for the house, a contract or a loan, some proof that she could pay him for his—for the house, that she might as well just not show up." Appellant told the coworker that Houston had called him a "motherfucker" in reply. He then told the coworker "something like, bitch thinks she can play me. Bitch thinks she can burn me, something indicating that he felt that Lucy could get away with doing this, not paying for the house." The coworker also testified that appellant had told her in earlier conversations "[t]hat it was his house and she wasn't going to get his house."

A second coworker, a notary, testified that she had notarized a transfer deed that appellant signed before her on October 26, 2001, but that she had no discussions with him about notarizing documents on November 21, 2001.

A third coworker recalled that before Houston's death, appellant told him he owned guns, including a .380 automatic specifically.

Respondent also presented phone records showing the last call from Houston's cell phone was at 6:17 p.m. on November 20, 2001. A witness, Barry, testified that he and Houston were platonic friends, and spoke by telephone at that time. Other telephone records showed that appellant's cell phone voice mail was accessed between 2:00 a.m. and 3:00 a.m. on the morning of November 21, 2001.

Respondent also presented testimony about the June and August 2001 incidents of violence between appellant and Houston. The police officer who took Houston's June 2001 statement testified that, independent of Houston's

statement, it appeared to him that a portion of Houston's hair had been pulled out of her head and that there was blood on her ear.

Two witnesses testified about the August 2001 incident as well. Appellant's neighbor testified that she saw appellant and Houston in front of their house on the day in question, heard appellant say, "[B]itch, you go get some keys from the other nigga," then appear to try to hit Houston, after which Houston ran to her car. She then saw appellant, looking angry, kick out a window on the driver's side of Houston's car. Houston's supervisor at the San Jose Mercury News also testified that Houston called her in August 2001 and told her appellant had broken out a window in her company car, and that she wanted her car and cell phone changed so that appellant would not be able to contact her or find her.

W.M. and S.P. testified about their affairs with appellant. S.P. testified that her involvement with appellant began in 2000, and W.M. testified that her involvement with him began in the spring of 2001. Each woman testified that appellant did not tell her that he was married.

B. *Appellant's Evidence*

Appellant's defense relied heavily on a witness who testified that she saw a man by Houston's parked car outside her home sometime between 6:30 a.m. and 7:00 a.m. on the morning of November 21, 2001. The witness initially told police on November 25, 2001, when Houston's body was discovered in the car's backseat, that she looked outside a window of her house early in the morning of November 21 and saw a black man who was "32 or 33 years old, about 6 [feet] 1 [inch] or 6 [feet] 2 [inches] and really thin, and maybe 150 pounds" emerging from Houston's car. She indicated at trial that he was "lanky," meaning "thin at the bottom, more broad at the top." The man's description of height and build apparently did not match that of appellant in 2001.

The witness acknowledged at trial that her recollections had changed significantly over time and that she had misled authorities in some of her accounts. She initially gave a written statement to police on November 25, 2001, then gave a recorded statement a few days later, and subsequently discussed the matter with appellant's investigator on August 2, 2003. In her recorded statement, she indicated the man was older than her original description, stating he was in his late 30's or early 40's, and later told appellant's investigator that the man was upward of 48 years old. At trial, she recalled a man of about 40 who was lanky, and who "looked as if he were locking a car. He did not drive up in the car." She was inconsistent in her accounts about the time she saw the man and whether the sun had been

shining. She admitted at trial that she had misled police about whether the sun was out in her written statement because she had wanted to get them out of her house, that she had not really read what the police had prepared from her comments before she signed it, and that she had previously lied to a prosecutor about whether or not she saw the man shut the car door because she did not want to appear in court. She also testified that she did not think she could identify the man she saw.

Appellant also relied on the testimony of two coworkers to contend that he was at work around the same time that this witness saw a man by Houston's parked car on the morning of November 21, 2001. One coworker testified that he saw appellant with a bloody nose in a bathroom at his Alameda workplace at 6:50 a.m. one morning. However, the coworker's testimony indicated he was less than certain whether he saw appellant on Tuesday, November 20, or Wednesday, November 21, 2001. When he was asked about the date, he testified that he had said in a recorded statement to police that it was Tuesday, but that it came out Wednesday because of a scratch in the tape. "I thought it was Tuesday. To the best of my knowledge I thought it was Tuesday. It could have been Wednesday. I can't say for sure." When pressed by appellant's trial counsel about the transcript of his remarks, he stated, "If Wednesday is what I said, then that's what I'll have to go with," and he did not argue with counsel's representation that the interviewing officers' notes also referred to Wednesday. The second coworker recalled appellant telling him by walkie-talkie at around 7:20 a.m. on Wednesday morning that appellant was returning to the yard from the field.

Appellant testified at trial as well, regarding many of the subjects raised by the prosecution. He denied killing Houston. He claimed to have substantial cleaning supplies in the house because a neighbor who worked for the Clorox Company had provided them to him, and to have previously plastered another wall in the house. He acknowledged having fights with Houston in June and August 2001, but downplayed each incident, contending, for example, that his actions in the June fight were the result of her violence towards him and suggesting that only extensions in her hair had come out.

Appellant testified that Houston had stayed the night with him on November 20, suggested that Houston had checked his voice mail in the middle of the night while he slept, and stated that he left her asleep in bed at around 6:25 a.m. or 6:30 a.m. on the morning of November 21, 2001. He testified that he did not worry about Houston when she failed to appear at his workplace on November 21, 2001, thinking she was "doing female, girlie things," and remained relatively unconcerned after her friends and police contacted him on November 23, 2001, because he "just thought she was wherever. Maybe she was with her boyfriend."

Appellant testified that Houston had been involved with two different lovers during their marriage. First, he testified that she had been involved with Barry, the witness who had testified about his November 20 telephone call with Houston. Appellant also testified that at the time of her death, Houston was lovers with a tall, thin, middle-aged African-American drug dealer named "Jesse." Appellant testified that he had been friendly with Jesse at one time, stating, for example, that he had been to his apartment and went to a picnic for a company where Jesse worked. He stated that after Jesse became involved with Houston, Jesse threatened him over the telephone when appellant told him not to call his house, and that Jesse continued to call and threaten him after Houston had moved out. Appellant's testimony about Jesse was lacking in many details; for example, appellant never provided any specific address for Jesse, nor could he recall the name of the company that held the picnic, or even Jesse's last name. Other than appellant's own testimony, neither appellant nor respondent presented any evidence showing that Jesse actually existed.[2]

Appellant claimed in direct examination that he initially told police "maybe you ought to check with her boyfriend." On cross-examination, he said that he did not bring up Jesse until after he had learned of the witness's report to police that she had seen a man of Jesse's description emerge from Houston's car in the early morning of November 21, 2001. After he was asked if he had testified on direct that he told police about Jesse, appellant claimed that he "probably did" tell police. Appellant claimed that Houston told him on November 20, 2001, the night she stayed with him at the Fresno Street house, that she had quarreled with Jesse earlier that day. He also contended that Jesse had keys to the house, and that he told police on November 23, 2001, that when he returned home on November 21, he noticed that, unlike normal, his house alarm was off and two-by-fours that typically secured the garage door were not in place.

Appellant denied telling his coworker soon after Houston's disappearance that he had previously torn up a grant deed transferring his interest in the house to Houston, contending instead that he signed and gave it back to Houston in late October 2001, who mailed them to the loan company, but that she later told him the loan company reported that it had not received them. He testified that he was ready to sign over his interest to Houston again on November 21, 2001, and that Houston told him she would give him a check for an agreed-to buy-out price of $38,000, and a contract indicating she would pay him an additional $2,000 over the next year.

---

[2] Appellant's trial counsel did argue that the testimony of a clerk at the hotel where Houston was staying that he, the clerk, saw her talking with a "tall" unidentified man in the hotel parking lot one evening, was proof of "Jesse."

Appellant also denied telling another coworker that he owned a .380 automatic, and stated that he lied to other people that he owned a gun. He also testified that he misled his work dispatcher about his whereabouts on November 24, 2001, because the dispatcher had said the police were going to arrest him.

Appellant testified that he told S.P. and W.M. that he was married. He contended that, contrary to S.P.'s testimony, she told him her child was *not* his, and that, regardless, any demands for child support would not have put him under financial pressure because he held significant assets.

Appellant testified that he loved his wife, and that they continued to have a relationship up to the time that she was killed. He testified about notes he said he gave to Houston in the months before her death in which he expressed his love, declared that he was her "dream come true," offered to move out of the house, and referred to her "new bitch man," a reference appellant testified was intended to refer to Jesse rather than Barry.

After appellant's representations about his marriage to Houston, respondent sought to cross-examine appellant regarding other extramarital affairs. After appellant at first stated he had only engaged in two affairs, he acknowledged two others. Appellant's counsel objected that the line of inquiry was not relevant and constituted improper character evidence. The trial court over-ruled his objections, and admonished the jury that the evidence of these two additional affairs should be considered only regarding the issue of appellant's credibility, and not his propensity to have murdered Houston.

The court also allowed respondent to ask appellant if he had had sex with W.M. in his house, and if several other women that respondent identified by name had been in the house after appellant's separation from Houston. Appellant's counsel objected that the testimony was inadmissible pursuant to Evidence Code section 352, but the court allowed the line of questioning to be admitted into evidence.

## C. *Closing Arguments*

Respondent's counsel opened his closing argument to the jury with a reference to the evidence from Houston's June 2001 police report, then moved to a lengthy discussion of the substantial circumstantial evidence that supported the conclusion that appellant killed Houston. He wove together numerous facts and physical evidence, such as the bullet found in the wall of appellant's upstairs bedroom at the Fresno Street house, to argue that appellant had shot and killed Houston in his bedroom on the evening of November 20, 2001, sometime after she arrived to attempt to persuade him to

sign over his interest in the house to her, moved Houston's car into his garage, wrapped the body in a blue tarp from his backyard, and removed it from the house. Respondent argued that if someone other than appellant had killed Houston in the house, they would have no incentive to remove her body from the premises in order to cover up their crime; only if a person lived in the house would they feel compelled to do so. Respondent argued "that [Houston] was killed there . . . and that the crime scene was covered up and the defendant is the only one with a motive to cover up the crime scene, that evidence alone is sufficient to prove to you beyond a reasonable doubt that this defendant killed his wife."

Respondent's counsel next contended that appellant had told numerous lies, and pointed to inconsistencies in appellant's statements and testimony, including regarding his claimed failure to find the friend's house on Thanksgiving; his ignorance about what time Houston was to pick up her friend at the airport; inconsistent statements about when he had moved Houston's car into his garage; his abrupt reference to his missing blue tarp; his misrepresentation about his whereabouts to police on November 24, 2001; and his statements before Houston's death that he owned a gun.

Respondent's counsel then detailed the evidence of Houston's efforts to persuade appellant to sign over his interest in the house to her, and appellant's statements to his coworker after her disappearance that he had argued with Houston about the house and said words to the effect that "The bitch wants to take my house." Respondent argued that appellant was deleting possibly incriminating telephone messages from Houston about the house from his voice mail in the early morning hours of November 21, 2001.

After this lengthy presentation, respondent's counsel referred to the disputed evidence of appellant's prior acts of violence against Houston to argue further that appellant was inclined to use violence against Houston and had a motive for killing her. Respondent's counsel argued, "This house buyout was the thing that set him off. He had his disposition to commit violence against [Houston] which when she tried to stand up for herself and assert herself. [*Sic.*] This is evidence that proves to you beyond a reasonable doubt that this defendant shot and killed Lucy Houston."

Appellant's trial counsel argued that respondent's case was a weak circumstantial evidence case and that the evidence, particularly the testimony of the witness who looked outside her home on the morning of November 21, 2001, and saw a tall, thin man by Houston's car, pointed to Jesse as the killer. He argued: "So, what I'm saying is that, there, she was in the brightness of the early morning sun, and she saw this individual. End of the case, ladies and gentlemen of the jury. End of the case. [¶] Since it's purely circumstantial,

since she obviously saw someone completely different, how can any objective, neutral, fair, just jury find my client guilty? End of the case."

Appellant's trial counsel contended that the evidence of appellant's prior acts of violence against Houston was the "centerpiece" of the prosecution's case. He discussed the incidents in some detail, using appellant's own testimony to argue that the June 2001 incident was a "reciprocal" fight and the August 2001 kicking out of the car window not direct violence against Houston.

Appellant's trial counsel offered various explanations for appellant's actions and statements. For example, he defended appellant's statements that he did not really own a gun, pointing out that no one had ever seen one owned by him, and argued that Jesse, as a drug dealer, would be much more likely to have one. He did not contest that appellant was upset about Houston's failure to assure him payment for his interest in the house, but insisted that appellant's instincts were "valid." He argued it was reasonable for appellant to want to consult with a lawyer before signing a police statement under the circumstances and that appellant had cooperated fully with police efforts to search his house. He pointed out that the police did not discover the patched portion of the bedroom wall the first time they looked through the house on November 23, 2001. Suggesting that Houston was killed elsewhere, he contended that it was "an overwhelming probability" that Jesse framed appellant by using his keys to enter the Fresno Street house while appellant was at work, putting a hole in the upstairs bedroom wall, planting a bullet there, and patching up the wall, all with the confidence that the police would find Houston's body and return to search the house again.

In his rebuttal, respondent's counsel pointed out the inconsistencies in the statements by the witness who saw a tall, lanky man by Houston's car on November 21, 2001; the evidence of numerous lies and inconsistencies in appellant's statements, actions and testimony; and the absence of any evidence besides appellant's own unconvincing testimony that Jesse actually existed.

D. *Jury Deliberations and Verdict*

In the course of discussing jury instructions, the parties revisited their differences over the evidence of appellant's extramarital affairs. The court expressed its own concerns that the use of these affairs not be used to show appellant was a "person of immoral character," and explained that it had allowed in the evidence regarding appellant's affairs with W.M. and S.P. as relevant to motive, and the evidence of other women being in the Fresno Street house as relevant to the fingerprints found in appellant's upstairs

bedroom. The court provided the jury with an instruction so limiting the jury's consideration of this evidence.[3]

On October 23, 2003, after deliberations that occurred over the course of four different days, the jury returned with their verdict. They found appellant guilty of the second degree murder of Houston, and that he used a weapon in violation of Penal Code section 12022.53, subdivision (d).

### E. *Motion for Hearing; Verdict; Appeal*

After the jury's verdict, appellant moved for an evidentiary hearing to establish grounds to move for a new trial based on purported spectator misconduct, namely the wearing of buttons and placards bearing Houston's likeness by certain spectators during the trial. At the hearing on this motion, a button and placard were admitted as exhibits, with the parties agreeing that the button was two and one-quarter inches in diameter and the placard about three inches wide and four and one-half inches long. The trial court denied appellant's request, stating that the buttons and placards were merely an "innocent means of remembrance" of Houston, that he had twice admonished the jury not to consider them, that no misconduct had occurred, and that even if it had, "it wasn't of such a character as to prejudice the defendant or influence the verdict in this case."

On December 12, 2003, appellant was sentenced to a term of 40 years to life, which consisted of 15 years to life for the murder conviction and 25 years to life for the weapon use. He was also ordered to pay restitution and credited with days in custody. Appellant filed a timely notice of appeal on December 24, 2003.

## DISCUSSION

### I. *Houston's Statements About Appellant's Violent Acts in June and August 2001*

Appellant contends that his federal constitutional rights to due process, confrontation and cross-examination were violated because Houston's June

---

[3] That jury instruction, CALJIC No. 2.50, stated:

"Evidence has been introduced for the purpose of showing that the defendant engaged in one or more extramarital relationships during the course of his marriage to Lucille Houston.

"Except as you may otherwise be instructed, this evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show:

"A motive for the commission of the crime charged; and

"To explain circumstantial evidence related to latent fingerprints.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case."

and August 2001 hearsay statements to police and hospital personnel that appellant had attacked her were testimonial in nature and, therefore, should have been excluded from the evidence pursuant to the United States Supreme Court's recent decision, *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). Respondent contends that Houston's statements were not testimonial pursuant to the interpretation of *Crawford* discussed in *People v. Cage* (2004) 120 Cal.App.4th 770 [15 Cal.Rptr.3d 846], review granted October 13, 2004, S127344 (*Cage*), and that, regardless of their admissibility, any error was harmless and, therefore, not grounds for reversal pursuant to *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. Since the parties submitted their appellate briefs in this matter, our Supreme Court has granted review of *Cage* and several other recent cases addressing what statements are and are not "testimonial,"[4] presumably to establish a clear definition of what is "testimonial" pursuant to *Crawford*. We do not need to determine here whether or not Houston's statements were testimonial in nature, however, because even if they were erroneously admitted, it was a harmless error in light of the overwhelming evidence of appellant's guilt and the cumulative nature of the evidence involved.

At the time of trial in this matter, constitutional inquiries regarding the admissibility of hearsay evidence were governed by *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], which allowed the admission of certain hearsay based upon a judicial determination of its reliability. (*Id.* at p. 66.) However, the Supreme Court overruled *Ohio v. Roberts, supra,* 448 U.S. 56, in *Crawford, supra,* 541 U.S. at pages 61–68 [158 L.Ed.2d at pp. 199–203]. The *Crawford* court held that, pursuant to the confrontation clause of the Sixth Amendment of the United States Constitution, a hearsay statement that is "testimonial" in nature cannot be used against a criminal defendant unless the declarant is available to testify at trial or has been available previously for defendant's cross-examination, regardless of a judicial determination about its reliability. (*Crawford, supra,* 541 U.S. at pp. 61–68.) The court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " (*Id.* at p. 203.)

We need not determine the constitutional issues raised by appellant, however, if any claimed error by the trial court in admitting Houston's statements was harmless beyond a reasonable doubt, pursuant to *Chapman v.*

---

[4] *Cage, supra,* 120 Cal.App.4th 770, review granted October 13, 2004, S127344; see also, e.g., *People v. Harless* (2004) 125 Cal.App.4th 70 [22 Cal.Rptr.3d 625], review granted March 23, 2005, S131011; *People v. Lee* (2004) 124 Cal.App.4th 483 [21 Cal.Rptr.3d 309], review granted March 16, 2005, S130570; *People v. Giles* (2004) 123 Cal.App.4th 475 [19 Cal.Rptr.3d 843], review granted December 22, 2004, S129852; *People v. Kilday* (2004) 123 Cal.App.4th 406 [20 Cal.Rptr.3d 161], review granted January 19, 2005, S129567; *People v. Caudillo* (2004) 122 Cal.App.4th 1417 [19 Cal.Rptr.3d 574], review granted January 12, 2005, S129212.

*California, supra,* 386 U.S. at page 24. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1015–1016 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [finding it unnecessary to examine a "complex constitutional question" because there was harmless error].) "Under that test, 'we must determine on the basis of "our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of the average jury," [citation], whether [the hearsay was] sufficiently prejudicial to [defendant] as to require reversal.' [Citations.]" (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128 [240 Cal.Rptr. 585, 742 P.2d 1306].) The admission of cumulative evidence, particularly evidence that is tangentially relevant to establishing a defendant's guilt, has been found to be harmless error. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1015–1016.) Even when confessions are involved, "if the properly admitted evidence is overwhelming and the . . . extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless." (*People v. Anderson, supra,* 43 Cal.3d at p. 1129.)

### A. *There Was Overwhelming Evidence of Appellant's Guilt*

The record here indicates that, regardless of Houston's June and August 2001 statements, there was overwhelming evidence that appellant murdered Houston, including that:

(1) Appellant and Houston had separated several months before her death and were in the process of divorcing.

(2) The two were arguing over the disposition of the Fresno Street house in their divorce, a house which appellant was possessive about and which remained his home.

(3) Appellant and Houston met at the Fresno Street house on the evening of November 20, 2001, and argued bitterly over the house.

(4) No one other than appellant reported seeing or hearing from Houston after November 20, 2001.

(5) Appellant reported that he had moved Houston's car into his garage sometime on the evening of November 20, or in the early morning of November 21, 2001.

(6) A witness saw Houston's car parked outside the witness's home on the street, within walking distance of the Fresno Street house, sometime between 6:30 and 7:00 a.m. on November 21, 2001, where police later discovered it.

(7) Houston's body was found on November 25, 2001, in the backseat of her car, mutilated by two gunshot wounds and containing a bullet from a .380

automatic, covered by a blue tarp, and an envelope containing real estate documents sent to Houston for appellant's execution was found in the backseat pocket of the driver's area.

(8) Police subsequently found a bullet inside a concealed, recently plastered area of a wall in appellant's bedroom, as well as a box spring in the bedroom that was damaged in a manner consistent with a bullet passing through it.

(9) A police firearms expert concluded from an extensive examination of the bullet recovered from Houston's brain and the bullet removed from appellant's bedroom wall that they were fired from the same gun, a .380 automatic.

(10) Police found joint compound and cleaning supplies in the Fresno Street house.

(11) Appellant did not report that anything was amiss inside the house before the police discovered the incriminating physical evidence discussed herein, and the house did not show signs of Houston having been there.

(12) Appellant's actions and statements in the days after Houston's disappearance were highly suspicious, including that although appellant contended that Houston failed to meet him as planned on November 21 and 22, 2001, he made no corroborated effort to find Houston or tell others that she was missing.

(13) During Houston's disappearance, appellant misled the police about his whereabouts because, as he told a coworker, he was afraid he would be arrested, and consulted with an attorney before signing a police witness statement, although evidence of a crime had not yet been discovered.

(14) During Houston's disappearance, appellant volunteered abruptly to police that a blue tarp was missing from his backyard.

(15) Prior to Houston's disappearance, appellant told a coworker that he owned a .380 automatic.

(16) Appellant had engaged in violent acts against Houston within months of her death, fighting with her in June 2001 just prior to their separation and kicking in her car window in August 2001.

Appellant did not present anything credible to rebut this incriminating evidence. He relied greatly on his own testimony. Over and over again, he

insisted that the testimony of other witnesses was false, and repeatedly testified in a self-serving and inconsistent fashion, to the point that no reasonable jury could find him credible. For example, he claimed that he was not worried about Houston when he spoke to police on November 23, 2001, yet stated in his written witness statement at the time that it was unlike Houston to be missing. Despite his professed lack of concern, appellant testified that he told police his house was not secured when he returned home on November 21, 2003, which is absent from his witness statement. He simply denied that he made incriminating statements to coworkers, such as that he had previously ripped up a grant deed, argued with Houston about the Fresno Street house when she stayed over at his house, or owned a .380 automatic. He testified that he gave Houston his signed grant deed in October 2001, but that she told him later that the loan company had never received the papers, and that he was ready to sign papers again on November 21, contradicting the testimony of the loan officer, Houston's friend, and appellant's coworker. His contentions that his fight with Houston in June 2001 was reciprocal and that he did not actually hit Houston in August 2001 when he kicked out her car window were unpersuasive distinctions that failed to rebut the evidence that he used violence against Houston on each occasion. Faced with damaging testimony from two women, W.M. and S.P., with whom he had affairs during his marriage, he claimed each was lying. He attempted to lie on the stand when he denied that he had had other affairs, admitting to them only after respondent persisted in cross-examination. He claimed that he had in effect misled people when it suited his purposes, testifying that he made statements to people in the past indicating that he owned a gun when he did not.

Most importantly, appellant could not explain how a bullet fired from the same gun as the bullet found in Houston's brain, and containing traces of Houston's DNA, made its way into a freshly plastered wall of his own bedroom. Appellant's insistence that Houston had a lover named "Jesse" who was the real killer was particularly incredible. He did not present any verifiable information about Jesse, not even his last name. Moreover, he acknowledged on cross-examination that he did not bring up Jesse until after learning of a witness's description of a man seen by Houston's car on November 21, 2001. Although he then backtracked to contend that he "probably told" police initially about Jesse, this too is absent from his police witness statement. In the end, appellant's trial counsel was left with little besides speculation to argue to the jury that Jesse had somehow framed appellant by planting the DNA-tainted bullet in his bedroom wall while appellant was away from his home.

Appellant also placed great emphasis on the witness who testified that she saw a tall, lanky man by Houston's car on the morning of November 21, 2001, and on coworkers' testimony that they saw him at work, arguing that

this was proof that someone other than appellant was the real killer. This evidence presented the only mildly controversial factual question in the case, and it was a very weak question at that, particularly in light of the overwhelming evidence of appellant's guilt. The witness who saw a tall, lanky man by Houston's car outside her home between 6:30 and 7:00 a.m. on the morning of November 21 changed her description of the man and his actions over time, indicating she was less than certain about what she saw in the first place. The coworker who saw appellant at their workplace provided similarly uncertain testimony about whether he saw appellant on the morning of November 20 or 21. The other coworker's testimony that he talked to appellant by walkie-talkie later on the morning of November 21, was relatively inconsequential, since it did not establish one way or the other if appellant was at his workplace earlier.

Furthermore, appellant's own statements undermined his contention that the "real killer" was seen standing by Houston's car on the morning of November 21, 2001. Appellant stated in his police witness statement that he left Houston at his house between 6:30 and 6:40 a.m. on the morning of November 21, 2001, and he testified at trial that he left Houston at his house at around 6:25 or 6:30 a.m. that morning. This left appellant's "real killer" a scant few minutes, if any at all, to kill Houston, wrap her in appellant's blue tarp, place her body in Houston's car, and drive to the location where, according to the witness's trial testimony, "he" was seen by Houston's car between 6:30 and 7:00 a.m. that morning. This time frame, if realistic at all, would also indicate that this "real killer" shot Houston at the Fresno Street house (contrary to appellant's trial counsel's suggestion in his closing argument that the murder occurred elsewhere), removed her body, and returned to the house to clean up and patch appellant's bedroom wall, although leaving the body and the evidence would have cast suspicion on appellant. In other words, appellant's story does not withstand even the slightest scrutiny.

Appellant's incredible story about another killer only underscores the importance of the physical evidence found in the Fresno Street house. Indeed, appellant's appellate counsel acknowledges the strength of this evidence in her opening brief to this court, stating, "the DNA on the bullet was strong circumstantial evidence that Houston was killed at home, making [a]ppellant the most likely agency of her demise." In short, the physical evidence found at appellant's home was very strong evidence and, when combined with the other circumstantial evidence, it was overwhelming evidence of appellant's guilt.

### B. *Houston's Statements Were Tangential and Cumulative*

As indicated by our discussion directly *ante*, Houston's June and August 2001 statements were tangential to the overwhelming evidence that appellant

murdered Houston at the Fresno Street house and then covered up his crime. The tangential nature of her statements was demonstrated by respondent's closing argument, in which respondent extensively discussed other evidence before delving into any detail about appellant's past acts of violence against Houston.

Houston's statements also were cumulative of other evidence unchallenged by appellant, including his own testimony. Houston's June 22, 2001 statements to police and medical personnel indicated that appellant had attacked her that day in a fight at the Fresno Street house, pulling out some of her hair and causing an injury to her finger, after Houston told him she wanted a divorce because she could not understand why he would stay out all night. Even if her statements had been excluded, there was testimony by the police officer who took her June 2001 statement that Houston appeared before him with a portion of her hair torn out and blood on her ear, and appellant's own testimony that he and Houston had fought that day. Furthermore, appellant testified that Houston left him that night and filed for divorce in the week following this incident, from which it could be inferred that their fight was related to problems in their marriage.

Houston's report to police about appellant's destruction of her car window in the August 2001 incident was similarly cumulative. A neighbor also testified that she saw appellant run after Houston and kick in her car window after appearing to try and hit Houston, Houston's employer testified that Houston told her what appellant had done, and appellant himself admitted kicking in the car window at trial. No one testified that appellant was set off by what Houston claimed in her report, an argument over the disposition of their Fresno Street house. However, other evidence already discussed, such as the testimony of the loan officer, of Houston's friend about Houston's efforts to obtain appellant's interest in the house, of a coworker recounting what appellant said about the subject, indicated that appellant and Houston were engaged in a bitter dispute over the Fresno Street house.

C. *The Jury's Deliberations Did Not Indicate This Was a "Close Case"*

Appellant also contends that the jury engaged in lengthy deliberations spread over the course of four days, thereby demonstrating that the case was a close one that requires a finding of prejudice here. This is incorrect.

Appellant cites our Supreme Court's conclusion that deliberations of almost 12 hours were an indication that a case was not "open and shut." (*People v. Cardenas* (1982) 31 Cal.3d 897, 907 [184 Cal.Rptr. 165, 647 P.2d 569].) Appellant does not refer to anything in the record that indicates how

many hours the jury deliberated below; without such information we cannot say the deliberations were lengthy merely because they were spread out over four days.

Furthermore, the length of a jury's deliberation is related to the amount of information presented at trial, as is indicated in another case cited by appellant, *People v. Filson* (1994) 22 Cal.App.4th 1841, 1852 [28 Cal.Rptr.2d 335], overruled on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452 [45 Cal.Rptr.2d 905, 903 P.2d 1037] (noting that jury deliberations were longer than the evidentiary phase of the trial). Here, the record indicates that there were extensive trial proceedings involving over three dozen witnesses occurring on 10 different days spread over three weeks, as well as lengthy closing arguments and jury instructions spread over two additional days. The jury's deliberation of this mass of information over the course of four days speaks only for its diligence. Its requests for the reading back of selected testimony does not necessarily indicate that this was a "close" case as appellant argues; in fact, the jury's time spent reviewing that testimony reduced their time spent actually deliberating. (*People v. Walker* (1995) 31 Cal.App.4th 432, 438 [37 Cal.Rptr.2d 167] [jury's 6.5 hours of deliberations after a 2.5-hour trial were not an indication of a "close case," particularly when some time was spent listening to testimony readbacks].) In short, to conclude that this was a "close case" in light of the jury's actions "in the absence of more concrete evidence would amount to sheer speculation on our part. Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Id.* at p. 439.)

Even assuming for the sake of argument that the jury's actions indicate this was a "close case," appellant argues only that this would mean that " 'any error of a *substantial* nature may require a reversal and *any doubt* as to its prejudicial character should be resolved in favor of the appellant.' [Citation.]" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 249 [15 Cal.Rptr.2d 112], italics added.) We have no reason to reverse under this standard because, as our discussion above indicates, any error was neither substantial nor arguably prejudicial.

Accordingly, any error by the trial court in admitting Houston's June and August 2001 statements was harmless beyond a reasonable doubt because the other evidence of appellant's guilt was overwhelming, and Houston's statements were both cumulative of other evidence and of a tangential nature. Therefore, any such error is not a ground for reversal here. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## II. *Evidence of the Victim's DNA on the Bullet Found in Appellant's Bedroom Wall*

Appellant next contends that the trial court committed reversible error by denying his pretrial motion to exclude the evidence of Houston's DNA found on the bullet recovered from inside a wall of appellant's bedroom because its admission was a violation of his federal due process rights. This too is incorrect.

■ The parties agree that the applicable law is stated in *People v. Roybal* (1998) 19 Cal.4th 481, 509–510 [79 Cal.Rptr.2d 487, 966 P.2d 521], as follows: "Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' [Citations.] To fall within the scope of this duty, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' [Citations.] The state's responsibility is further limited when the defendant's challenge is to 'the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' [Citation.] In such case, 'unless a criminal defendant *can show bad faith on the part of the police*, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' [Citations.]" (Italics added.)

■ Our Supreme Court has also made clear that "[when] the prosecution finds it necessary to consume the evidence in order to test it, there is no due process violation. The prosecution must be allowed to investigate and prosecute crime, and due process does not require that it forego investigation in order to avoid destroying potentially exculpatory evidence." (*People v. Griffin* (1988) 46 Cal.3d 1011, 1021 [251 Cal.Rptr. 643, 761 P.2d 103].)

The parties also agree that we apply a substantial evidence standard of review to the trial court's denial of appellant's motion; that is, "we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal, supra,* 19 Cal.4th at p. 510.)

At the pretrial hearing below on whether or not to exclude the DNA evidence, an experienced forensic biologist for the Oakland Police Department testified that she received the bullet on November 29, 2001, and examined it prior to anyone's being arrested for Houston's murder. She consulted with the department's firearms expert, who wanted to test the bullet

as well, and decided that she should conduct her examination of the bullet first to avoid the possibility that the firearms expert would destroy potential biology in handling it. She then put the bullet in a plastic tube with digestion material, which digested all of the DNA off of the bullet. While she acknowledged that it was preferable not to digest all of the DNA off of the bullet, she also explained why alternatives suggested by appellant's counsel in his cross-examination of her would not work. She also tested only a portion of the biological material recovered from the bullet, and took steps to preserve the remainder, which was about three times the amount she tested herself. The remainder was still available for testing at the time of the pretrial hearing.

The court denied appellant's motion, ruling that the DNA evidence did not necessarily identify appellant directly, but indicated only "that circumstantially at some point the decedent in this case . . . had contact with the slug," rather than specifically and directly pointing at the appellant. The court found that the police used reasonable methods to examine the bullet under the circumstances, that the defense still had the opportunity to examine any possibly exculpatory material taken from the bullet, and that there was no evidence that anyone had willfully destroyed any potentially exculpatory material.

Appellant contends on appeal that the forensic biologist acted improperly because she "made no attempt to find an alternative to total consumption of the sample other than consulting with a firearms expert, who presumably was not well versed in DNA testing and solutions to her problem. . . . Although a portion of extracted DNA remained available for retesting, [a]ppellant was foreclosed from determining the reliability of the extraction process itself." The forensic biologist's lack of action by itself, however, does not indicate bad faith, which is an essential element to appellant's claim. (*People v. Griffin, supra*, 46 Cal.3d at p. 1022.) To the contrary, the evidence indicates that she acted in good faith and in furtherance of the state's legitimate interests in examining the bullet in the course of the police investigation. She testified that she consulted with the department's firearms expert to determine the order of their tests so as to preserve as much biological material as possible; was unaware of any other method she could have applied for her testing; and took steps to preserve the material extracted from the bullet for later testing. Appellant does not cite to any evidence showing that the forensic biologist deliberately avoided finding ways to partially consume the biological material, or that any method in fact exists that would have allowed her to partially consume the biological material on the bullet. In short, there simply is no evidence that she acted in bad faith. (See *People v. Roybal, supra*, 19 Cal.4th at pp. 509–510 [testimony indicating a door jamb was lost because of inadvertent police error was insufficient to establish bad faith].)

Appellant cites two cases for the proposition that police should be "careful to preserve the ability of both parties to have independent testing." As respondent points out, nothing in these cases alters the analysis. In *People v. Cooper* (1991) 53 Cal.3d 771 [281 Cal.Rptr. 90, 809 P.2d 865], the court found that where there was only enough material for one test, the defendant did not have the right to seize that material, test it confidentially and keep the results from the prosecution. (*Id.* at pp. 814–816.) None of this is at issue in the present case. Similarly, in *Prince v. Superior Court* (1992) 8 Cal.App.4th 1176 [10 Cal.Rptr.2d 855], the court found that the trial court had erred by preventing the petitioner from conducting confidential, independent tests of extracted semen, half of which had been allocated to it. (*Id.* at p. 1181.) This is not at issue here either; to the contrary, the extracted DNA was preserved and nothing in the record indicates it was unavailable to appellant to test independently and confidentially, if he so wished.

We find, therefore, that there was substantial evidence to support the trial court's denial of appellant's motion to exclude the DNA evidence. Accordingly, we affirm the court's ruling.

III. *Evidence Regarding Appellant's Extramarital Affairs*

Although appellant does not contest on appeal most of W.M.'s and S.P.'s testimony about their relationships with appellant during his marriage to Houston, appellant argues that the trial court committed prejudicial error, and violated his due process rights, by admitting their testimony that he did not tell them he was married, as well as by allowing respondent to cross-examine him about other extramarital affairs and women.

■ A trial court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will, among other things, "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352 (section 352).) "Under Evidence Code section 352, the court must strike a balance between the probative value of the evidence and the danger of prejudice. The court must consider ' "the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relative to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion." [Citation.]' " (*People v. Harlan* (1990) 222 Cal.App.3d 439, 445 [271 Cal.Rptr. 653].) ■ A trial court's discretionary ruling under section 352 will not be disturbed on appeal absent an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

As we discuss *post*, the disputed evidence was admissible because it was relevant, in part because appellant put his own credibility at issue in the case. Regardless, the admission of the contested evidence was not particularly prejudicial.

### A. *W.M.'s and S.P.'s Testimony About Appellant's Deceit*

Appellant first contends, as he did below, that the trial court should not have allowed W.M. and S.P. to testify that appellant failed to tell them that he was married because it "was nothing more than inflammatory bad character evidence" that should have been excluded pursuant to section 352. Respondent essentially restates its arguments that this evidence was relevant to the credibility of appellant and of W.M. and S.P.[5] The trial court admitted the evidence, noting that "the fact that [S.P. and W.M.] knew whether he was married or not probably affects them more than it affects him. The fact that he was carrying on, the jury is going to know he was married at the time." The parties do not dispute that the court cautioned respondent about conducting any lengthy examination on the subject, and that respondent's examination consisted of one question to each witness.

The court did not abuse its discretion in admitting this evidence of appellant's deceit because it was relevant to appellant's credibility. The past lies of a party can be relevant to credibility issues in murder cases. (See *People v. Coddington* (2000) 23 Cal.4th 529, 613 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618] [allowing questions of psychiatric experts about whether defendant had lied to them because their opinions about his sanity were based in part on his statements to them].) Appellant's account to police of what Houston and he did just prior to her disappearance, as well as his explanation of his actions thereafter, were a part of the case. His own trial counsel acknowledged in his opening statement that appellant would testify, and that the jury "will be able to judge his credibility . . . . He will be the most important witness that we present with respect to the overall case." Under these circumstances, evidence of his deceit in the recent past was relevant.

The trial court also did not abuse its discretion by allowing in this testimony of deceit because it was also relevant to W.M.'s and S.P.'s credibility as witnesses. The jury might have viewed W.M.'s and S.P.'s credibility differently if the women testified that they knowingly participated

---

[5] In the proceedings below, respondent referred to the question of whether or not the women knew appellant was married as the "big pink elephant in the room" that, left unaddressed, could result in jurors thinking the women were "little tramps that decided to go break apart a home . . . ."

in the deceit of a hidden, extramarital affair. Furthermore, the jury might have viewed appellant's pride in the Fresno Street house differently if W.M. had testified that she understood appellant was speaking as part of a married couple. Similarly, the jury could have viewed S.P.'s efforts to obtain appellant's financial support for their child differently if S.P. had acknowledged conceiving the child while aware that appellant was married.

## B. *Cross-examination of Appellant About Other Extramarital Affairs*

Appellant also contends that the court should not have allowed respondent to cross-examine him about other extramarital affairs. Respondent asked appellant a number of questions about Houston's accusing him of having affairs, and then asked appellant to name the women with whom he had engaged in affairs during his marriage to Houston. Appellant answered, "Just those two," meaning W.M. and S.P. Appellant's counsel objected to this line of inquiry as irrelevant, and the trial court overruled the objection. After additional questioning, appellant disclosed that he had had extramarital affairs with two more women. After his counsel's renewed objection, the court admonished the jury that the evidence should be considered for the issue of appellant's credibility, but not for his propensity to have committed the charged crime.

Later that day, outside the presence of the jury, appellant's counsel objected to the evidence as irrelevant character evidence. Respondent argued that appellant had opened the door by introducing into evidence an August 24, 2001 note he claimed to have written to Houston, which purportedly showed that his relations with her were good after their separation. The note states:

"Lucy I love you. Lucy, I love you so much that I can't help but inform you my true feelings. I just wanted to be the man—I just wanted to be the man that is so good to you. I am—I am a sensitive person and not a madman but a loving man. No one can be a better man than I.

"When it comes to you, I am a—I am a dream come true just for you. Thank you for the card. It is so real. I love you, Lucy. Your nature boy."

Respondent argued that appellant's stated sentiments in the note were deceptive and masked his true emotions, as evidenced by his extramarital affairs, while appellant's counsel countered that the marriage was an open one at the time of the note and, therefore, the affairs were not relevant. The court overruled appellant's objections again, cautioning respondent against going into "352 sort of areas" and stating the basis of its ruling was that the evidence "does raise issues of credibility."

In respondent's subsequent cross-examination of appellant, respondent asked appellant if he ever had sex with W.M. at the Fresno Street house and if any of four other women had been in the upstairs bedroom of the house during his separation from Houston. Respondent's stated purpose for this line of inquiry was to explain why there were unidentified latent fingerprints in the house, apparently out of concern that the defense would argue that the unidentifiable fingerprints indicated that someone other than appellant killed Houston. Appellant's counsel again objected to the questions as violating section 352. The court allowed continued questioning on the subject.

▮ The court did not abuse its discretion in allowing in this evidence, whether it be for motive, credibility, or to explain the latent fingerprints. Evidence of an accused spouse's intimate relations with others is relevant to the state of his or her marital relationship with the victim spouse and, therefore, to motive. (See *People v. Gosden* (1936) 6 Cal.2d 14, 25 [56 P.2d 211] [noting that " '[n]o rule is more firmly established than that, upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love [or] affection for the defendant's lawful spouse' "]; see also *People v. Brown* (1955) 131 Cal.App.2d 643, 661 [281 P.2d 319] [relations with other women were relevant to a defendant's motive to engage in a conspiracy to murder his wife].) Appellant put his feelings about Houston at issue by testifying that he had good relations with her in the months before her murder. The evidence of his affairs was relevant to show that these relations were not as good as he contended. Moreover, evidence had already been admitted that appellant had had affairs with W.M. and S.P. during his marriage, substantially reducing the prejudicial impact of these additional affairs.

Furthermore, the evidence was relevant to appellant's credibility, particularly given that his August 24, 2001 note to Houston specifically states that he loved her, and that he was "a dream come true *just for* you." (Italics added.) It could be inferred from evidence of his extramarital affairs that appellant was deceiving Houston with such a statement, regardless of his trial counsel's claims of an open marriage.

Finally, respondent was entitled to introduce evidence regarding the latent fingerprints found in appellant's bedroom in anticipation that the defense might contend the prints belonged to the "real" killer. Indeed, as we have already discussed, appellant's trial counsel did argue that Jesse entered the house while appellant was absent and planted a bullet containing Houston's DNA in appellant's bedroom wall in an effort to frame appellant.

## C. *Lack of Prejudicial Error*

Even if we assume, for the sake of argument, that the court erred by admitting the extramarital affairs evidence, it did not commit any prejudicial error requiring reversal. As we have already discussed, there was other overwhelming evidence, particularly the physical evidence found in the Fresno Street house, that appellant murdered Houston. The extramarital affairs evidence was not strongly probative of this other evidence, except for the evidence regarding women who had been in appellant's house, which was clearly relevant.

Furthermore, the extramarital affairs evidence was cumulative in two respects. To the extent the evidence raised the issue of extramarital affairs, it was cumulative of W.M.'s and S.P.'s testimony that they each had an intimate relationship with appellant during his marriage. To the extent the evidence raised issues about appellant's willingness to deceive, there was other admissible evidence of his deceit. This included S.P.'s testimony that he assured her financial help, but failed to provide it; his deception regarding his whereabouts during Houston's disappearance; and his own testimony that he lied to people about owning a gun, which, whether true or not, indicated his willingness to deceive.

Finally, the court's instruction to the jury to limit its consideration of the extramarital affairs evidence to motive and to latent fingerprints evidence, and not to consider it as evidence of appellant's bad character, appropriately contained the impact of the testimony to the relevant issues in the case. As appellant acknowledges in his opening brief, the jury is presumed to follow the court's instructions (*People v. Bryden* (1998) 63 Cal.App.4th 159, 184 [73 Cal.Rptr.2d 554]). Appellant does not present anything to lead us to conclude otherwise.

Accordingly, the court did not abuse its discretion pursuant to section 352 in admitting any of the extramarital affairs evidence, nor did any prejudicial error occur. For the same reasons, appellant's contentions that admission of the evidence violated his due process rights and was so prejudicial as to require reversal are not correct. Although appellant arguably waived these constitutional arguments on appeal by not raising them below (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1]), we have assumed for the purposes of discussion that appellant did not do so because of the important constitutional questions involved (see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310 [97 Cal.Rptr.2d 727]). We find any purported constitutional error was harmless beyond a reasonable doubt (*Chapman v. California, supra,* 386 U.S. at p. 24) and that it was not reasonably probable that the outcome would have been different in the

absence of any purported error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[6]

### IV. *The Trial Court Did Not Err Regarding Spectator Displays of Buttons and Placards Bearing Houston's Likeness*

Appellant contends that his federal constitutional rights to due process and a fair trial were violated by certain spectators' wearing of buttons and placards bearing Houston's likeness in the courtroom, and that the trial court erred by refusing to grant him an evidentiary hearing in which he could develop a factual record establishing that actual prejudice resulted from this misconduct. He requests we remand this matter to the trial court for such an evidentiary hearing. We deny appellant's request because, in light of the particular facts and issues before the jury in the trial below, any inherent prejudice was minimal enough to be cured by the court's prompt admonitions to ignore the displays. Any actual prejudice was harmless beyond a reasonable doubt because of the overwhelming evidence of appellant's guilt.

During appellant's direct examination, the trial court noted that a number of spectators were wearing buttons bearing the likeness of Houston. The court admonished the jury that, while spectators could wear them, the buttons were not evidence and the jury should not consider them for any purpose. The court stated: "It was brought to my attention today and I also observed personally that a number of people that are here observing this trial are wearing buttons about three inches in diameter that appear to bear the likeness of Lucille Houston. . . . [¶] I'm just admonishing each of you if you have seen the buttons, its perfectly proper for the buttons to be worn. There's absolutely nothing wrong with that. On the other side of the coin . . . I guess the fact that people are in court that do wear buttons in support or in remembrance of Lucille Houston is not evidence in this case and should not be considered by you for any purpose."

During closing arguments, the court again noted that there were people in the audience wearing "badges" in support of Houston: "Ladies and gentlemen, before we hear from [appellant's trial counsel], let me once again admonish you. I guess that's a stronger word than I intended it to be, but to counsel you, please, that it's obvious that today that the people in the audience are again wearing badges in support of. And that's not evidence in this case. [¶] Same admonishment bears that I gave earlier concerning that. Some of you may have noticed it; some of you may not have noticed it. That really isn't evidence in this case."

After the court's second admonishment, appellant's trial counsel began his closing argument to the jury with the following statement:

---

[6] Accordingly, appellant's ineffective assistance of counsel argument, presented in a brief footnote in his opening appellate brief, is without merit.

"I sense that there's a number of the good friends and relatives of Lucille Houston in the audience . . . . And it is appropriate that we all have a level of bereavement for her, and it is appropriate that her friends and relatives attend this proceeding.

"And it is legal that they can wear some manifestation of their loved one on their person. On the other hand, it sometimes . . . it is felt by a jury to be some form of subliminal or direct psychological input, that somehow they are here and their presence and their manifestation of love is an indicator that the accused is more likely to be guilty than not guilty.

"That's not true. His honor has so indicated. Their presence is not evidence. And they are putting on you no pressure, and they are entering into this court with no psychological motive of persuading you or manipulating you. They are here because they are rightfully bereaved and they enjoy a constitutional right to show their allegiance."

After the jury found appellant guilty of second degree murder with the use of a weapon, appellant's trial counsel moved for an evidentiary hearing to develop evidence of grounds for a new trial based on what he now claimed was spectator misconduct, i.e., the displays of the buttons and placards. He stated in a declaration that he had objected during the evidentiary phase of the trial when he noticed spectators were wearing on their upper garments badges of Houston that displayed a photograph of her, and objected again during closing argument when he noticed that "a much increased segment of spectators," some sitting in a front row previously reserved for law enforcement, were wearing rectangular placards displaying Houston's likeness, where on more than one occasion the jury "walked right by them on the way to the jury box." He stated that he could not recall whether he asked for a mistrial, but that he did on both occasions ask for orders that the displays be removed or, if the court was not so inclined, for admonitions to the jury.[7] Respondent contended in its opposition brief that because of the large number of spectators in the courtroom for closing argument, the front row had been opened up to spectators other than law enforcement, that law enforcement spectators did not wear any buttons or placards during the trial, and that not all of the spectators in the front row wore a placard or button.

At the hearing on appellant's motion, the parties agreed that the button had a diameter of 2.25 inches and that the placard was three inches wide and just shy of four and one-half inches long. Appellant's counsel argued that the buttons and placards were "a silent, manipulating maneuver by the part of the

---

[7] Any such discussions between the court and counsel outside the presence of the jury are not contained in the record.

spectators who were obviously here on the side of the prosecution," and requested that the jurors be brought in and asked if they felt the placards affected their verdict. Respondent argued that there was no authority for the court to order spectators to remove the buttons and placards, no indication that the verdict was affected, and no real basis for the requested evidentiary hearing. The trial court denied the motion, stating that it did not recall if respondent's counsel had requested a mistrial earlier, but that the buttons and placards were "a rather innocent means of remembrance" of Houston, that it had twice admonished the jury not to consider them, that there was no misconduct, and even if there had been misconduct, "it wasn't of such a character as to prejudice the defendant or influence the verdict in this case." Nothing in the record indicates that the jury was actually prejudiced by the buttons and placards.

### A. Any Inherent Prejudice Was Cured by the Trial Court's Admonitions

The first question presented by appellant's claim of spectator misconduct is whether or not the court's two admonitions cured any inherent prejudice presented by the spectators' displays of buttons and placards bearing Houston's likeness. We conclude that they did in light of the particular facts and issues before the jury.

██ As appellant points out, the right to a fair trial is a fundamental liberty. "A criminal defendant has the right to be tried in an atmosphere undisturbed by public passion." (*Norris v. Risley* (9th Cir. 1989) 878 F.2d 1178, 1181 (*Norris I*).) Spectator misconduct can violate a defendant's constitutional rights if it is " 'so inherently prejudicial as to pose an unacceptable threat . . . .' " (*Musladin v. Lamarque* (9th Cir. 2005) 403 F.3d 1072, 1081 (*Musladin*)); that is, "an 'unacceptable risk is presented of impermissible factors coming into play . . .' " (*Id.* at p. 1074; *Norris v. Risley* (9th Cir. 1990) 918 F.2d 828, 830–831 (*Norris II*).) In determining whether purported misconduct at trial was "unduly suggestive of guilt," a court should be mindful that " 'the actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But . . . the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.' " (*U.S. v. Olvera* (9th Cir. 1994) 30 F.3d 1195, 1196, quoting *Estelle v. Williams* (1976) 425 U.S. 501, 504 [48 L.Ed.2d 126, 96 S.Ct. 1691] [defendant should not have been required at trial to say the words heard spoken by a lisping bank robber]; see also *Woods v. Dugger* (11th Cir. 1991) 923 F.2d 1454, 1457 ["a risk becomes unacceptable when there is a 'probability of deleterious effects' "].)

■ Courts have long recognized that misconduct at trial can be cured by admonitions and instructions. For example, our Supreme Court has held that a motion for mistrial based on a claim that a defendant's federal due process rights were violated at trial should only be granted if the court " ' "is apprised of prejudice that it judges incurable by admonition or instruction." ' [Citation.]" (*People v. Lucero* (2000) 23 Cal.4th 692, 713–714 [97 Cal.Rptr.2d 871, 3 P.3d 248].) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling . . . ." ' [Citation.]" (*Id.* at p. 714.) Thus, the " 'mere fact that a spectator is guilty of some misconduct . . . does not mandate the declaration of a mistrial, . . . especially where the judge takes immediate action to avert possible juror prejudice.' " (*People v. Miranda* (1987) 44 Cal.3d 57, 114 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■ Jurors are presumed to follow a court's admonitions and instructions. (*Romano v. Oklahoma* (1994) 512 U.S. 1, 13 [129 L.Ed.2d 1, 114 S.Ct. 2004] [improper admission of evidence did not deny due process in light of the court's jury instructions about the scope of evidence the jury was to consider]; *People v. Harris* (1994) 9 Cal.4th 407, 426 [37 Cal.Rptr.2d 200, 886 P.2d 1193].) "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702] [finding no confrontation clause violation caused by the admission of a nontestifying defendant's confession in light of the court's limiting instruction].)

Two Ninth Circuit cases have found inherent prejudice in displays of buttons and the like by courtroom spectators in the absence of admonitions to the jury, *Norris II, supra,* 918 F.2d 828, and *Musladin, supra,* 403 F.3d 1072. The *Norris II* defendant was on trial in state court for kidnapping and rape. A number of women spectators wore buttons in and around the courtroom with the word "Rape" underlined with a broad red stroke. The state court denied the defendant's motion to exclude the women from the courtroom or have them remove the buttons, finding it did not have the power to do so, particularly in light of the spectators' First Amendment rights. (*Norris II, supra,* at pp. 829–830.)

The defendant was found guilty, and subsequently filed a habeas petition in federal district court, which turned down his petition without an evidentiary hearing. (*Norris I, supra,* 878 F.2d at p. 1180.) On appeal, the Ninth Circuit determined that the defendant's allegations that 20 women wore "Women Against Rape" buttons, if true, would be "inherently prejudicial" (*id.* at

pp. 1182–1183), and remanded to the district court for an evidentiary hearing to determine the facts of what had occurred.

The district court determined that approximately 15 women from two different organizations wore buttons with the word "Rape" underlined in a broad red stroke in and around the courtroom, that the buttons were two and one-half inches in diameter, and that at least three jurors had seen the buttons; at any given time, three women were wearing the buttons either inside or outside the courtroom. (*Norris II, supra,* 918 F.2d at pp. 829–831.) After the district court found no inherent prejudice from these facts, the defendant appealed again to the Ninth Circuit.

In *Norris II, supra,* 918 F.2d 828, the Ninth Circuit stated, "To decide whether that risk was unacceptable we specifically look at the relationship of exposure to the buttons to two facets of the right to a fair trial: the presumption of innocence and the right of confrontation and cross-examination." (*Id.* at pp. 830–831.) "[B]ecause we can never fully know the extent to which the buttons influenced any juror, we must review the trial judge's failure to exclude those wearing buttons, 'based on reason, principle, and common human experience,' to determine whether it involved an unacceptable risk of allowing such impermissible factors to come into play." (*Id.* at p. 834.) The court found that the presence of the women wearing the buttons " 'constituted a statement, not subject to cross-examination, that in the opinion of the members of the Rape Task Force the complaining witness had been raped by the defendant.' [Citation.]" (*Id.* at p. 833.) It concluded that the buttons were inherently prejudicial because "the risk that the buttons had an impact on the jurors is unacceptably high," and, therefore, the defendant did not receive a fair trial. (*Id.* at p. 834.) It instructed the district court to grant the writ if the state did not promptly retry the defendant. (*Ibid.*)

In *Musladin, supra,* 403 F.3d 1072, Musladin had been charged with murdering his estranged wife's fiance in an argument, during which he admittedly fired a gun in the fiance's general direction. (*Id.* at p. 1073.) Musladin argued perfect and imperfect self-defense, contending that there was no crime and no victim involved. During each of the 14 days of his jury trial, the deceased's family sat in the front row of the gallery, directly behind the prosecution and in clear view of the jury, with at least three family members at a time wearing "very noticeable" buttons several inches in diameter on their shirts displaying the deceased's photograph. Before opening statements, the court denied Musladin's request that it instruct the family members to refrain from wearing the buttons in court. (*Ibid.*)

Musladin, after he was convicted of first degree murder and related offenses and sought reversal in state court without success, filed a petition for

writ of habeas corpus in federal district court arguing that the state court had unreasonably applied clearly established federal law in violation of the Antiterrorism and Effective Death Penalty Act (which is not at issue in the present case) in determining that his rights to a fair trial had not been violated by the family members' display of buttons. His petition was denied, and he appealed to the Ninth Circuit. (*Musladin, supra*, 403 F.3d at p. 1073.)

The Ninth Circuit agreed that the state court had unreasonably applied the federal law "that certain practices attendant to the conduct of a trial can create such an 'unacceptable risk of impermissible factors coming into play,' as to be 'inherently prejudicial' to a criminal defendant . . . ." (*Musladin, supra*, 403 F.3d at p. 1074.) The court found that the state appellate court, although it had cited *Norris II, supra,* 918 F.2d 828, for the relevant law, nonetheless had misapplied *Norris II* in two regards. First, the state court should not have distinguished the facts between the two cases because they could not "reasonably be distinguished." (*Musladin, supra*, 403 F.3d at p. 1076.) In fact, the *Musladin* court found the message delivered by the *Musladin* buttons to be "substantially more direct and clear" than those in *Norris II* because "the direct link between the buttons, the spectators wearing the buttons, the defendant, and the crime that the defendant allegedly committed was clear and unmistakable." (*Musladin*, at p. 1077.) "The primary issue at Musladin's trial was whether it was the defendant or the deceased who was the aggressor. The buttons essentially 'argue' that [the deceased] was the innocent party and that the defendant was necessarily guilty; that the defendant, not [the deceased], was the initiator of the attack, and, thus, the perpetrator of a criminal act." (*Ibid.*) The *Musladin* court rejected the state court's conclusion that the buttons "were 'unlikely to have been taken as a sign of anything other than the normal grief occasioned by the loss of a family member' " because under the "particular facts and issues before the jury . . . . a reasonable jurist would be compelled to conclude that the buttons worn by [the deceased's] family members conveyed the message that the defendant was guilty, just as the buttons worn by spectators in [*Norris II*] did in that case." (*Ibid.*)

Second, the *Musladin* court found that the state appellate court had added a legal requirement not present in federal law because, although the state court considered " 'the wearing of photographs of victims in a courtroom to be an "impermissible factor coming into play" ' " (*Musladin, supra*, 403 F.3d at p. 1076), it found no federal law violation because the buttons had not "branded defendant 'with an unmistakable mark of guilt . . . .' " (*Ibid.*) The *Musladin* court, after reviewing the relevant United States Supreme Court

decisions,[8] found that the state court "was unreasonable in imposing this additional requirement after it had concluded that the 'inherent prejudice' elements had already been fully established." (*Musladin,* at p. 1078.) The court concluded that "the state court, disregarding the consideration that the central question was one of self-defense . . . ." and, in light of its misapplication of both the facts and law, acted in a manner that "was objectively unreasonable," which required reversal and remand for issuance of a writ of habeas corpus. (*Id.* at p. 1079.)

We follow *Musladin*'s instruction and look past the "general sentiment" reflected in the buttons and placards displayed at appellant's trial in the present case to "determine the specific message [conveyed] in light of the particular facts and issues before the jury." (*Musladin, supra,* 403 F.3d at p. 1077.) In doing so, we find the particular facts and issues present before the jury were significantly different than those discussed in *Norris II* and *Musladin* in two important respects. First, in the context of this particular trial, the buttons and placards, to the extent they delivered any message, delivered an ambiguous one. In *Norris II, supra,* 918 F.2d 828, allowing the displays of "rape" buttons in the courtroom suggested the defendant was guilty as charged of that crime. Similarly, in *Musladin,* where the defendant contended he fired the shots that killed the deceased in self-defense, the displays of the deceased's image unacceptably risked sending the message that he was a victim and therefore, that the defendant was a murderer. In the present case, however, the spectator displays did not contain any text analogous to the "Rape" displayed in *Norris II,* such as "Murder." Nor did the displays *inappropriately* suggest that the deceased, Lucille Houston, was a victim; indeed, since an integral part of appellant's defense was his own portrayal of Houston, who he professed to love, as a victim likely killed by her jealous lover, Jesse. His own counsel told the jury, regarding the spectator displays, "it is appropriate that we all have a level of bereavement for her," and went on to characterize the spectators' displays as a "manifestation of their loved one," just as the court characterized them as an "innocent means of remembrance" in denying appellant's motion for a new trial.[9] Given the facts and issues of this particular trial, jurors could have reasonably thought that individuals sympathetic to appellant were among those displaying buttons and placards. (See *Holbrook v. Flynn, supra,* 475 U.S. 560 [presence of

[8] See *Estelle v. Williams, supra,* 425 U.S. 501; *Holbrook v. Flynn* (1986) 475 U.S. 560 [89 L.Ed.2d 525, 106 S.Ct. 1340].

[9] The trial court's characterization of the displays as an "innocent means of remembrance" further distinguishes this case from *Musladin, supra,* 403 F.3d 1072, which holding was based in significant part on the state appellate court's incorrect rejection of appellant's claim *despite* the state court's determination that the spectator displays had caused impermissible factors to come into play at trial. Here, in contrast, the trial court found that the displays were not of such a character as to cause prejudice or influence the jury's verdict when it denied appellant's motion for a new trial.

armed guards at trial was not inherently prejudicial because the jurors could have just as easily believed the officers were there to guard against outside disruptions as to prevent violence in the courtroom].) In other words, the displays of Houston's likeness did not imply that *appellant* murdered Houston, nor suggest a comment about a disputed issue between the parties. Accordingly, we seriously question whether the displays caused "a 'probability of deleterious effects' " or constituted an "unacceptable" risk of impermissible factors coming into play at the trial. (*Woods v. Dugger, supra*, 923 F.2d at p. 1457.) If they caused inherent prejudice, it was minimal.

Furthermore, and most importantly, unlike *Norris II, supra*, 918 F.2d 828, or *Musladin, supra*, 403 F.3d 1072, neither of which indicated that the trial courts admonished the juries to disregard subject displays, the trial court below admonished the jury to do so twice, promptly upon being informed of spectators' displays of Houston's likeness. Given the facts and issues of the trial, these admonishments cured any inherent prejudice that might have been caused by the displays.

A number of federal courts have found court admonitions sufficient to cure or mitigate against any inherent prejudice caused by claimed due process violations at trial. In *Brown v. Terhune* (N.D. Cal. 2001) 158 F.Supp.2d 1050, for example, the district court rejected a petition for writ of habeas corpus based in part on spectator misconduct at trial in California state court. A bailiff had informed the trial court that a trial observer had entered an elevator after closing argument and before the instructions to the jury, and commented, in the presence of most of the jurors, "You better not convict an innocent man. You better not convict an innocent man." (*Id.* at p. 1081.) The California appellate court, treating the incident as spectator misconduct, held that no evidentiary hearing regarding the matter was necessary in light of the content of the allegation, the seriousness of the misconduct, and the credibility of the source, pursuant to *U.S. v. Angulo* (9th Cir. 1993) 4 F.3d 843.[10] The federal district court held that the appellate court's presumption that the trial court's admonition to the jury cured the error, in the absence of any evidence to the contrary, was not contrary to, nor an unreasonable application of, clearly established federal law. (*Brown v. Terhune, supra*, 158 F.Supp.2d at p. 1082.)

In *U.S. v. Elder* (9th Cir. 2002) 309 F.3d 519, the Ninth Circuit reviewed the removal of defendant's lawyer from the courtroom in handcuffs. After a

---

[10] Although the parties here do not discuss the standards outlined in *U.S. v. Angulo, supra*, 4 F.3d 843, we conclude, applying these standards, that, in light of the public nature of the displays involved in appellant's case, the minimal, if any, prejudice that could have been caused by them, and the court's admonitions, the trial court properly determined that no evidentiary hearing was necessary.

recess, counsel returned to the courtroom and the court "cleared the air"; the court also instructed the jury at the conclusion of the evidence that they were not to consider the incident in their deliberations. (*Id.* at p. 520.) The Ninth Circuit, although it made clear that it was making "an extremely narrow, highly-fact-intensive exception" to its general rule that such incidents were " 'so inherently prejudicial as to pose an unacceptable threat' to a fair trial," held that the defendant's due process rights were not violated, in part because of "the nature of the specific curative instruction given to the jury to mitigate any prejudice resulting from counsel's removal from the courtroom . . . ." (*Ibid.*; see also *Maiden v. Bunnell* (1994) 35 F.3d 477, 482–483 [any inherent prejudice resulting from the trial judge's isolated comment during jury selection indicating that jurors should convict suspects more often was cured by the admonition that he later gave making clear that he disavowed any such view].)

Several recent opinions issued by our Supreme Court regarding due process claims based upon prosecutorial and spectator misconduct at trial also have found admonitions sufficient to cure inherent prejudice. For example, in *People v. Dennis* (1998) 17 Cal.4th 468 [71 Cal.Rptr.2d 680, 950 P.2d 1035], the defendant contended that the prosecutor had made extensive mischaracterizations of the evidence throughout closing argument. The Supreme Court acknowledged that the prosecutor's misstatements bore the potential for prejudice, but noted that the trial court had "cautioned the jury that counsel's arguments were not evidence and should not be considered as such," and concluded that "none of the purported misdescriptions, misstatements, or misrepresentations defendant cites was so outrageous or inherently prejudicial that an admonition could not have cured it." (*Id.* at p. 521; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 615 [21 Cal.Rptr.3d 612, 101 P.3d 509] [appellant forfeited federal due process claim on appeal because any prejudice from a prosecutor's derogatory references to the defendant could have been cured by an admonition].) These prosecutorial misconduct cases are particularly noteworthy because our Supreme Court has stated that "because a spectator does not wear the same cloak of official authority as a prosecutor, most instances of spectator misconduct will likely be more easily curable than those of a prosecutor." (*People v. Hill* (1992) 3 Cal.4th 959, 1000 [13 Cal.Rptr.2d 475, 839 P.2d 984] (*Hill*), overruled in part on other grounds in *Price v. Superior Court, supra,* 25 Cal.4th 1046, 1069, fn. 13.)

*People v. Lucero* (1988) 44 Cal.3d 1006 [245 Cal.Rptr. 185, 750 P.2d 1342] is particularly relevant here because our Supreme Court found that the trial court's prompt admonition cured spectator misconduct that was arguably worse than that claimed here. During the closing argument for the guilt phase of a defendant's trial for first degree murder and arson involving two young girls, the mother of one of the girls interrupted the defendant's counsel as he

argued that the absence of screams or other sounds by neighbors indicated the killings were not premeditated. The mother cried out, "There was screaming from the ball park. They couldn't hear the girls because there was screaming from the ball park. That's why they couldn't hear it. The girls were screaming—screaming from the ball park, screaming, screaming, screaming. That wasn't in the case. Screaming, screaming from the ball park. Why wasn't that brought up? Why, why, why?" (*Id.* at p. 1022.) The mother was escorted to just outside the courtroom, where she was attended to for several minutes, but her "screaming" could be heard from the corridor. (*Id.* at p. 1022.) After the outburst, the trial court directed the jurors to retire for deliberations with a cursory admonition to disregard the outburst and denied the defendant's motion for a mistrial. (*Ibid.*) The defendant argued on appeal that the mother's outburst caused particularly serious prejudice because it came at the worst possible time, imparted facts outside the record, and occurred in a capital case. The Supreme Court, noting the limited nature of the outburst, the court's "prompt admonition," and its broad discretion in cases of spectator misconduct, found that the trial court acted properly in denying the defendant's motion for a mistrial. (*Id.* at pp. 1022–1024; see also *Hill, supra,* 3 Cal.4th at p. 1002 [admonitions cured any prejudice from spectators' outbursts, including one by the murder victim's mother during defendant's closing argument].)

Similarly, in *People v. Craig* (1978) 86 Cal.App.3d 905 [150 Cal.Rptr. 676], it was alleged that certain spectators had acted to prejudice the defendant's right to a fair trial, specifically, picketers outside the courthouse and a spectator in the courtroom who made hand gestures during the testimony of a defense witness. (*Id.* at pp. 919–920.) The appellate court held that the trial court did not abuse its discretion when it denied defendant's motion for a mistrial because of the trial court's prompt admonitions. (*Id.* at p. 920.)

Nothing about the spectator displays at issue in the present case was more threatening to appellant's right to a fair trial than the kinds of misconduct discussed in these cases. The spectator displays delivered an ambiguous message at best, were relatively passive, did not impart any facts outside the record to the jury, and did not involve misconduct by anyone wearing a cloak of official authority. Appellant's own counsel mitigated any inherent prejudice by his comments at the beginning of his closing argument, which he made without objection by respondent or interference by the court. Accordingly, under the particular facts and issues before the jury in this case, the court's prompt admonitions cured any inherent prejudice that may have resulted from these spectator displays.

### B. *Any Actual Prejudice Was Harmless Beyond a Reasonable Doubt*

Appellant also argues that we should remand this matter for an evidentiary hearing in order for it to be determined if the jurors were *actually* prejudiced by the actions of spectators here. We disagree. The trial court was correct in finding that any such prejudice would not be a basis for reversal here.

 As we have already discussed above, assuming for the sake of argument that the trial court erred in denying appellant an evidentiary hearing to pursue his claims of federal constitutional error, there nonetheless can be no reversal if the constitutional error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.) Moreover, to the extent appellant may claim any error under California law, "[m]isconduct on the part of a spectator is a ground for [a] mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict. (*People v. Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442], cert. den. *sub nom. Slocum v. California* (1976) 426 U.S. 924 [49 L.Ed.2d 379, 96 S.Ct. 2635].) A trial court is afforded broad discretion in determining whether the conduct of a spectator was prejudicial. (*Ibid.*)" (*People v. Lucero, supra*, 44 Cal.3d at p. 1022.)

Again, the evidence of appellant's guilt was overwhelming and the buttons and placards ambiguous at best in their message. The trial court, upon receiving notice of the buttons and placards, promptly admonished the jury to ignore them entirely. Under these circumstances, the buttons and placards could not have prejudiced the jury's determinations. (See, e.g., *People v. Craig, supra,* 86 Cal.App.3d at p. 920 [even assuming errors occurred as a result of the jurors' viewing of picketing outside the courthouse or the hand motions of a spectator during a defense witness's testimony, the errors were harmless pursuant to *Chapman v. California, supra,* 386 U.S. at p. 24].)

Appellant cites additional case law for his contention that an evidentiary hearing is required, but it is not relevant here. In *People v. Pennisi* (1990) 149 Misc.2d 36 [563 N.Y.S.2d 612], a court found the wearing of red and black ribbon corsages to be disruptive of the courtroom and ordered them removed. However, that opinion, issued by the trial court itself, merely held that the trial court was entitled to exercise its discretionary powers to have the corsages removed under New York state law, not that the court was required to do so under the federal Constitution. Appellant similarly cites several state court cases from around the country that found when jurors were not aware of purportedly offensive clothing or buttons, the clothing or buttons were unobjectionable. This is not at issue here.

Appellant argues that under California law an evidentiary hearing based on the mere possibility of spectator misconduct is required, citing *People v.*

*Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], which appellant acknowledges involved the possibility of *juror* misconduct. Appellant's contention must be rejected in light of the broad discretion given to courts to control spectator misconduct under California law. In the present case, unlike in *People v. Burgener, supra,* 41 Cal.3d 505, the court determined in its discretion that its admonishments were sufficient. Appellant gives us no reason to interfere with the trial court's exercise of this discretion, particularly when the jury is presumed to follow a court's instructions, as we have already noted.

Accordingly, we find that any spectator misconduct here was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.) Therefore, the trial court acted properly in denying appellant's motion for an evidentiary hearing.[11]

██ Nonetheless, we are most concerned that spectator practices such as the wearing of buttons and placards displaying a victim's likeness at trial can be unduly disruptive to the trial process. Here, for example, the trial court admonished the jury on two separate occasions during the trial that the jury was to ignore these buttons and placards, and appellant's counsel took time to address the issue in his closing argument. Even if these buttons and placards evoked somber feelings about Houston alone, it was unnecessarily disruptive to the trial that they became an issue at all. "Trial courts possess broad power to control their courtrooms and maintain order and security." (*People v. Woodward* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954], citing Code Civ. Proc., § 128.) The better practice of any trial court is to order such buttons and placards removed from display in the courtroom promptly upon becoming aware of them in order to avoid further disruption.

██ Still, we are mindful that appellant " ' "is entitled to a fair trial . . . not a perfect one." ' " (*People v. Miranda, supra,* 44 Cal.3d at p. 123, quoting *Schneble v. Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 92 S.Ct. 1056].) He received a fair trial in the trial court below.

---

[11] Given our finding that any actual prejudice was harmless beyond a reasonable doubt, we do not actually determine whether any such prejudice occurred when the trial court allowed the buttons and placards to be worn in the courtroom and denied appellant's request for an evidentiary hearing. Furthermore, because of the important constitutional issues raised, we again assume for the purposes of discussion that appellant did not waive his rights to raise these issues on appeal, as respondent contends. (See *People v. Jennings, supra,* 81 Cal.App.4th at p. 1310.) Similarly, since we find that any inherent prejudice was cured by the trial court's admonitions and any actual prejudice was harmless beyond a reasonable doubt, we need not consider appellant's ineffective assistance of counsel argument, based on his possible failures to raise properly stated objections below.

## DISPOSITION

We affirm the trial court's rulings and appellant's conviction in their entirety.

Kline, P. J., and Haerle, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 21, 2005. George, C. J., did not participate therein.