Filed 6/16/15  P. v. Aguilar CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAIME AGUILAR,<br><br>    Defendant and Appellant. | A141410<br><br>(San Francisco City and County<br>Super. Ct. No. SCN220079) |

Jaime Aguilar was convicted by jury of two counts of willful infliction of corporal injury on a cohabitant, two counts of simple assault, and one count of making a criminal threat.  On appeal, Aguilar contends the evidence was insufficient to support the conviction for making a criminal threat, and the court was required to instruct, sua sponte, on attempted criminal threat as a lesser included offense.  We agree that an instruction on the lesser included offense was required.  Accordingly, the judgment with respect to making a criminal threat must be reversed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The San Francisco District Attorney charged Aguilar by information with infliction of corporal injury upon a cohabitant (Pen. Code, § 273.5, subd. (a);[1] counts one & three), assault by force likely to produce great bodily injury (§ 245, subd. (a)(4); count two), assault with a deadly weapon (§ 245, subd. (a)(1); count four), and criminal

---

[1] Undesignated statutory references are to the Penal Code.

1

threats (§ 422; counts five & six).[2]  In connection with counts three and five, it was further alleged that Aguilar used a screwdriver as a deadly weapon (§ 12022, subd. (b)(1)).

*Prosecution Case*

M.R. lived with Aguilar from October 2011 until April 2013 at a hotel on Valencia Street in San Francisco.  At trial, M.R. testified that she considered Aguilar "like [her] husband."

In June 2012, prior to the charged incidents, Aguilar argued with M.R. about money and tried to prevent her from leaving the hotel with a girlfriend.  Aguilar, who had been drinking, pulled her jacket from behind and grabbed her hair.  A witness saw Aguilar yanking on M.R.'s hair and called the police.  M.R. appeared scared.  When police officers arrived, M.R. was crying.  The officers saw a red imprint of a zipper on M.R.'s neck.  She told the police Aguilar had not hit her.  Several days later, she signed a termination of investigation form.  M.R. remained in a relationship with Aguilar because she was very attached.  After he was released from jail, Aguilar apologized and told M.R. that he loved her.

M.R. testified that on April 1, 2013, Aguilar came home from work, but then went back out.  M.R. called him multiple times asking him to bring home medicine for her toothache.  Aguilar stated that he was drinking beer with friends.  When he returned home, at midnight, M.R. could tell he was drunk because he had red eyes and had trouble standing.  Aguilar shouted at M.R. to leave.  She attempted to do so after putting on a sweater.  Aguilar grabbed M.R. from behind, pulled her hair, punched her in the chest, and threw her on the bed.  He pulled a screwdriver out of a drawer, stood above her, pointed the screwdriver at M.R.'s chest, and said, "I'm going to kill you, mother fucking bitch."

M.R. thought about her mother and children and begged for strength from God.  She grabbed Aguilar's hands and attempted to calm him with "nice words."  She told

---

[2] Counts one through five all pertained to events alleged to have occurred on April 2, 2013.  Count six involves threats allegedly made on April 6, 2013.

Aguilar, "[D]on't do anything that's going to get you in terrible trouble. If I die, you're going to go to jail." Aguilar "seemed to come to his senses," turned the screwdriver around, hit M.R. in the stomach with the handle, and then threw the screwdriver at her nose.

M.R. asked, "[W]hy are you doing these things? What's happening to you?" Aguilar responded by kicking M.R. in the leg and insulting her. He urged M.R. to call the police, but stated that they would not arrest him. He gave M.R. her phone, but then took it away and broke it by throwing it against a wall. M.R. did not scream or call for help, but she was crying.

Aguilar told M.R. that he wanted to have sex with her. He told her to go to the bathroom and "put on something sexy." M.R. complied because "[Aguilar] was very crazy, and [she] was scared." After less than five minutes in the bathroom, Aguilar opened the door and told her she was taking too long. Aguilar forcefully pulled off her underwear, causing M.R. to tremble with fear. Aguilar then grabbed her hair and pushed her onto the bed. Aguilar again stated that he wanted to have sex. M.R. said she did not "want to do anything with [him]," but did not physically resist. They had vaginal sex and then Aguilar forced M.R. to perform oral sex. He then turned her around and forced his penis into her anus.

M.R. testified that "the whole thing lasted about one hour." Eventually, Aguilar fell asleep. M.R. did not sleep but continued to cry. She did not call the police after Aguilar fell asleep. She did not want to "hurt him" or cause his arrest.

On the morning of April 2, 2013, M.R. had red marks on her chest and stomach, a swollen leg, and a red, swollen nose. She missed work because of her injuries and because Aguilar prevented her from leaving. Aguilar said he loved her and that their problems would end. Aguilar left the hotel at one point to get some food. M.R. could have left, but she did not. She did not know what to do or where to go.

Three days later, on April 5, 2013, Aguilar told M.R. he wanted to go the police station because "somebody was bothering him." The two went to the police station together and Aguilar spoke to an officer at the window. M.R. did not report Aguilar's

3

attack because she was with him and did not want the police involved. When they returned home, Aguilar told M.R. to move out because he did not trust her. M.R. left, but then returned when Aguilar was not home to get her belongings. She requested entry from the building manager and took her belongings to a friend's house. M.R. testified that she took nothing belonging to Aguilar, although she did keep a diamond ring that he had given her. She considered the ring her own.

Aguilar called M.R. after she had retrieved her belongings. She told him she was not coming home. On April 6, 2013, Aguilar left M.R. several voicemail messages, in which he insulted her, accused her of stealing the diamond ring, and suggested he had filed a police report. He stated, "that ring . . . you took is worth more than one year of your life in money. . . . [I]t's going to end for you, bitch . . . . [Y]ou're going to be taken off."

After listening to the messages, M.R. decided that Aguilar was not going to leave her alone, and she filed a police report on April 6, 2013. M.R. told police that Aguilar had threatened to kill her while holding a screwdriver in his hand. Photographs were taken, showing bruises on M.R.'s chest and other injuries. M.R. cried during police questioning.

M.R. testified at trial that she still loved Aguilar. On cross-examination, M.R. confirmed having told investigators on June 26, 2013, that she did not believe Aguilar's threats were real. She said Aguilar was a strong man and would have killed her if he really wanted to do so.

San Francisco Police Officers Antonio Flores and Liza Tiffe also testified regarding an April 10, 2013 interview of Aguilar. During that interview, Aguilar said he was drinking on April 1 until 11:00 p.m., but nothing happened between him and M.R. after he went home. Aguilar said that he and M.R. had broken up, on April 5, after arguing about her request to sell the ring. Aguilar had refused because the ring was not M.R.'s. According to Aguilar, M.R. stole the ring, a $500 check, and $400 in cash after they argued. However, he did not report the alleged theft.

4

Flores also testified as an expert witness on intimate partner battering syndrome. Flores opined that M.R.'s late reporting was consistent with the condition, which manifests when a person feels that they cannot leave a physically or mentally abusive relationship. The syndrome results in a cycle of violence, in which peaceful "honeymoon" periods alternate with abusive periods. The aggressor in the relationship seeks control and the victim minimizes the abuse. Accordingly, it is common for victims to recant or drop charges. The victim often does not leave the relationship because of many factors including lack of economic means or alternate housing, low self-esteem, and their feelings for the abuser.

*Defense Case*

Aguilar testified in his own defense. Both he and M.R. were from El Salvador. They started dating in 2011, and M.R. began staying at his hotel room. On Monday, April 1, 2013, Aguilar went to work and returned home at approximately 4:15 p.m. When M.R. returned home from shopping, Aguilar went with her to withdraw $340 from an ATM machine, and then they got takeout, and bought some lubricant. Aguilar later went to a bar with a friend where he drank six to eight beers and watched a Giants' game. M.R. stayed at home. When Aguilar arrived home, M.R. greeted him with a kiss. They engaged in consensual sex. Aguilar did not hit M.R. or use a screwdriver in any way. Aguilar testified that, in response to M.R. telling him about a sexual fantasy, he used a vibrator to hit her in the chest. M.R. did not state that she was in pain or that she wanted Aguilar to stop.

Aguilar owned a ring that M.R. had worn for months. Aguilar never gave her the ring. She had specifically asked for it and he said "no." On April 5, 2013, Aguilar and M.R. went to the police station so that he could report harassing phone calls he was receiving. M.R. did not speak to anyone. When they returned home, M.R. suggested selling the diamond ring, which he did not want to do. She got upset. Aguilar left to go to an appointment. When he got home, M.R.'s bags were gone, as well as $500 in cash, the ring, and a $420 check. He was upset and felt betrayed. He left angry voicemail

5

messages on M.R.'s phone, called her a thief, insinuated that he had filed a police report, and tried to make her feel bad.

The resident manager of the hotel testified that M.R. was never a resident at the hotel, only a visitor. The manager was unaware of the June 2012 incident.

*Verdict and Sentence*

The jury found Aguilar guilty of two counts of willful infliction of corporal injury on a cohabitant (§ 273.5, subd. (a); counts one & three) and one count of making a criminal threat (§ 422; count five). The jury found the screwdriver use allegations "not true." The jury found Aguilar not guilty of the aggravated assault charges (§ 245; counts two & four), but guilty of the lesser included offenses of simple assault (§ 240). No verdict was reached on count six, and it was dismissed under section 1385. Aguilar was sentenced to two years and eight months in prison. He filed a timely notice of appeal.

## II. DISCUSSION

Aguilar does not challenge sufficiency of the evidence to sustain his convictions for assault and for willful infliction of corporal injury on a cohabitant. He contends only that the evidence is insufficient to support conviction on count five and that the court was required to instruct, sua sponte, on attempted criminal threat (§§ 664, 422) as a lesser included offense. We agree that an instruction on the lesser included offense was required.

A.   *Substantial Evidence*

Aguilar contends that the jury's verdict on count five is not supported by substantial evidence. When faced with such a challenge, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

"A reviewing court must accept logical inferences the [fact finder] might have drawn from the circumstantial evidence. [Citation.] ' "A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416–1417.) We will not substitute our evaluations of the witnesses' credibility for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

In order to prove a violation of section 422, the prosecution must establish: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally . . . was on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*); *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605; § 422, subd. (a).)

Aguilar challenges only the sufficiency of evidence with respect to the third and fourth elements—whether the threat was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and whether the threat actually caused the victim to be in sustained fear for her own safety. Regarding the third element, the evidence most favorable to the People shows that, after grabbing M.R. by the hair and punching her in

7

the chest, Aguilar pushed her onto the bed, stood above her, brandished a screwdriver and said, "I'm going to kill you, mother fucking bitch."

The statute does not concentrate on the precise words of the threat but whether the threat communicated a gravity of purpose and immediate prospect of execution of the threat. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) " 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 340.) "Section 422 demands that the purported threat be examined 'on its face and under the circumstances in which it was made.' The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137 (*Ricky T.*).) Even an ambiguous statement may be found to be a criminal threat if the circumstances clarify its meaning. (*In re George T.* (2004) 33 Cal.4th 620, 635 (*George T.*); *People v. Butler* (2000) 85 Cal.App.4th 745, 753.)

"The circumstances surrounding a communication include such things as the prior relationship of the parties and the manner in which the communication was made. [Citation.] Although an intent to carry out a threat is not required, the actions of the accused after making the communication may serve to give meaning to it. [Citation.] And, just as affirmative conduct and circumstances can show that a criminal threat was made, the absence of circumstances that would be expected to accompany a threat may serve to dispel the claim that a communication was a criminal threat." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) Evidence that the defendant previously subjected the victim to violence is "thoroughly germane" to whether a particular statement will be taken as a threat and whether the victim was in a state of sustained fear. (*People v. Garrett* (1994) 30 Cal.App.4th 962, 967.) A defendant's activities after the threat may give meaning to his words and show whether he "meant serious business" when he made the threat. (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221.)

Aguilar relies on *George T., supra,* 33 Cal.4th 620 and *Ricky T., supra,* 87 Cal.App.4th 1132 to support his position. But neither case is on point. In *George T.,* a student gave two classmates a poem, which recited in part, "I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!! For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!" (*George T.,* at p. 625.) At least two of the classmates receiving the poem testified that they were frightened after reading it and understood it to be personally threatening. (*Id.* at pp. 625–627.) The student, however, testified that the poem was not intended to be a threat, it was " 'just creativity.' " (*Id.* at p. 628.) The reviewing court concluded the poem did not constitute a violation of section 422. "As is evident, the poem . . . is ambiguous and plainly equivocal. . . . [¶] . . . [¶] Unlike some cases that have turned on an examination of the surrounding circumstances given a communication's vagueness, incriminating circumstances in this case are noticeably lacking: there was no history of animosity or conflict between the students [citations], no threatening gestures or mannerisms accompanied the poem [citations], and no conduct suggested to [the classmates] that there was an immediate prospect of execution of a threat to kill [citation]. Thus the circumstances surrounding the poem's dissemination fail to show that, as a threat, it was sufficiently unequivocal to convey . . . an immediate prospect that minor would bring guns to school and shoot students." (*George T.,* at pp. 636–638.)

In *Ricky T.* a student was accidentally hit with a door by his teacher, and immediately told the teacher he would "get" him, and "kick [his] ass." (*Ricky T., supra*, 87 Cal.App.4th at pp. 1135–1136, 1138.) The teacher felt threatened and sent the student to the school office. The student immediately complied and there was "no evidence that [the student] exhibited a physical show of force, displayed his fists, . . . or attempted to batter [the teacher] or anyone else." (*Id.* at p. 1138.) The reviewing court reversed, concluding that the student's statements in that context were ambiguous and "no more than a vague threat of retaliation without prospect of execution." (*Ibid.*)

Here, neither Aguilar's words, nor the surrounding circumstances were ambiguous. Aguilar did not use an inherently ambiguous artistic expression, such as the

9

poem in *George T.* Nor was there an absence of threatening circumstances, as presented in *Ricky T.* Instead, Aguilar directly told M.R., "I'm going to kill you," immediately after grabbing and punching her, and while he stood above her with a weapon in hand. The People correctly point out that the jury's "not true" finding on the screwdriver use enhancement allegation does not mean necessarily that the jury believed that no screwdriver was used. But even if we ignore M.R.'s testimony about the screwdriver, there was ample evidence of Aguilar's physical aggression immediately before and after he made the threat, as well as in the couple's history.

The facts of this case are even stronger than those presented in *People v. Butler, supra,* 85 Cal.App.4th 745, in which the defendant confronted the victim, grabbed her arm, called her "a fucking bitch," and told her she needed to mind her own business or she "was going to get hurt." (*Id.* at pp. 753, 754–755.) The court found that, considering all the circumstances, the defendant expressed a willingness and intent to hurt her if she did not mind her own business, and that this sufficiently demonstrated a violation of section 422. (*Butler,* at pp. 754–755.) Substantial evidence was presented to allow a rational jury to conclude that Aguilar's threat was sufficiently unequivocal, unconditional, immediate and specific to convey a gravity of purpose and immediate prospect of death or serious bodily injury.

Substantial evidence also supports the fourth element—that the threat actually caused the victim to be in sustained fear for her safety. "[S]ustained fear" is defined as a period of time "that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) In arguing the evidence was insufficient, Aguilar relies on M.R.'s testimony that Aguilar "seemed to come to his senses" after her pleas. He also relies on M.R.'s June 26, 2013 statement that she did not believe Aguilar's threats were real.

On the other hand, M.R. testified that after hearing the threat she thought about her mother and children and begged for strength from God. She grabbed Aguilar's hands and attempted to calm him with "nice words." She also told Aguilar, "[D]on't do anything that's going to get you in terrible trouble. If I die, you're going to go to jail."

10

Furthermore, against her own wishes, M.R. submitted to Aguilar's sexual demands for a period of approximately an hour. For example, she testified that she went to the bathroom to "put on something sexy" because "[Aguilar] was very crazy, and [she] was scared." When she reported the attack five days later, she was visibly upset. A reasonable jury could infer that the statutory element of sustained fear was met. (See *People v. Allen, supra,* 33 Cal.App.4th at p. 1156 [defendant was arrested within 15 minutes of making threat, but 15 minutes of fear was sufficient]; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 [sustained fear satisfied by one minute during which victim heard threat and saw gun; "[w]hen one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory' "].)

Aguilar again misplaces his reliance on *Ricky T., supra,* 87 Cal.App.4th 1132, in which the reviewing court also found insufficient evidence to support the victim's sustained fear. In that case, the victim said he " 'felt threatened,' " ordered the student to the school office, but police were not notified until the next day. (*Id.* at p. 1140.) The court explained: "Apparently, fear did not exist beyond the moments of the encounter. Rather than taking advantage of [the victim's] fear, [the defendant] followed his directive and placed himself in the school office . . . ." (*Ibid.*)

Here, in contrast, M.R. was unable to physically separate herself from Aguilar during the early morning hours of April 2, 2013. M.R. did not contact police right away, but the jury could reasonably understand this circumstance to be explained by the nature of the relationship and the evidence that Aguilar destroyed M.R.'s phone. Substantial evidence supports the jury's verdict on count five.

B.      *Failure to Instruct on Lesser Included Offense of Attempted Criminal Threat*

Aguilar also argues that the trial court erred by failing to instruct the jury on attempted criminal threat. We review de novo an alleged "failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included in, a charged offense." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Even in the absence of a request, the trial judge has a sua sponte duty to instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of

11

the lesser offense (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*)), or where there is evidence which, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser (*People v. Waidla, supra*, 22 Cal.4th at p. 733). Failure to instruct on a lesser included offense is problematic because it forces "an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other." (*People v. Birks* (1998) 19 Cal.4th 108, 119.) "[N]either party has a greater interest than the other in gambling on an inaccurate all-or-nothing verdict when the pleadings and evidence suggest a middle ground . . . ." (*Id.* at p. 127, italics omitted.) Thus, "regardless of the tactics or objections of the parties, or the relative strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on any and all lesser included offenses, or theories thereof, which are supported by the evidence." (*Breverman,* at p. 160, italics omitted.)

The parties agree that attempted criminal threat is a lesser included offense of the charged crime. (*Toledo, supra,* 26 Cal.4th at pp. 230, 232; *In re Sylvester C., supra*, 137 Cal.App.4th at p. 607.) The question is only whether substantial evidence required instruction on the lesser offense. "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman, supra,* 19 Cal.4th at p. 177.) " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)

We agree with Aguilar that *Toledo, supra*, 26 Cal.4th 221 is dispositive. In that case, the defendant had been charged with making a criminal threat when, during an argument with his wife, he told her, " 'You know, death is going to become you tonight. I am going to kill you.' " (*Id.* at p. 225.) The wife said she did not care and walked away. The defendant approached, aiming the point of a pair of scissors at her throat. The wife eventually left the apartment but attempted to return later that same evening. She told an investigating officer that she was afraid the defendant was going to kill her. At trial, the wife denied any fear. The jury found the defendant not guilty of making a criminal threat but guilty of attempted criminal threat. (*Id.* at pp. 225–226.)

12

On review, our Supreme Court held that attempted criminal threat was a crime and that a defendant is guilty of it "whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action." (*Toledo, supra,* 26 Cal.4th at p. 230.) The court explained: "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat. For example, . . . if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. . . . [O]nly a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Id.* at p. 231, italics omitted.) In upholding the defendant's conviction, the court observed that the jury properly could have found that the defendant's threat "was made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and reasonably could have caused [the wife] to be in sustained fear for her own safety. At the same time, however, the jury might have entertained a reasonable doubt [in view of the wife's testimony that she was not afraid] as to whether the threat actually caused [her] to be in such fear." (*Id.* at p. 235, italics omitted.)

Similar to the victim in *Toledo*, M.R. told investigators that she did not believe Aguilar's threats. From this testimony, as well as the fact that M.R. did not immediately contact police or leave the hotel room, the jury could reasonably infer that she was not afraid or only momentarily afraid. The jurors were entitled to accept or reject all of M.R.'s testimony, or a portion of her testimony, as well as any of Aguilar's testimony. (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 261, disapproved on other grounds by *People v. Smith* (2013) 57 Cal.4th 232, 241–242.) There was substantial evidence which, if accepted, would have absolved the defendant from guilt of the greater offense, but not the lesser.

Reversal is not warranted unless an examination of the entire record discloses that the error produced a "miscarriage of justice." (Cal. Const., art. VI, § 13.) This test is not met unless it appears " 'reasonably probable' " the defendant would have achieved a more favorable result had the error not occurred. (*Breverman, supra*, 19 Cal.4th at pp. 149, 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Reasonably probable " 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1055.) Aguilar meets that test.

Here, there was ample evidence M.R. suffered sustained fear, given her trial testimony about her demeanor, thoughts, emotions, and compliance after the threat. We also cannot fault the jury for inferring M.R.'s motive to later minimize the events in statements to investigators given her testimony regarding her continued love for Aguilar and Flores's testimony regarding intimate partner battering syndrome. Although the prosecution certainly presented substantial evidence that Aguilar was guilty of the completed offense, we cannot say that the evidence was overwhelming. The evidence also supports the possibility that, if instructed on the lesser included offense, one or more jurors could have reasonable doubts about whether Aguilar's threats in fact caused M.R. sustained fear.

The jury requested readback of M.R.'s testimony regarding the April 2 assault. Requests for readback do not necessarily indicate a " 'close' case." (*People v. Houston* (2005) 130 Cal.App.4th 279, 301; *People v. Walker* (1995) 31 Cal.App.4th 432, 436–438.) However, courts have found such requests, when combined with evidence of guilt that is not overwhelming, to suggest prejudicial error. (*People v. Lacefield, supra,* 157 Cal.App.4th at p. 262.) Furthermore, the jury returned a "not true" finding on the deadly weapon use enhancement allegation, was unable to reach a verdict on count six, and convicted Aguilar of lesser included assault offenses. There was a reasonable chance Aguilar would have obtained a more favorable outcome had the jury been instructed on the lesser included offense. We therefore reverse Aguilar's criminal threat conviction.

14

"When a greater offense must be reversed, but a lesser included offense could be affirmed," the People have the "option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) At the People's request, we preserve this option for election on remand.

### III. DISPOSITION

The judgment of conviction is reversed with respect to count five. In all other respects, the judgment is affirmed. If, after the filing of the remittitur in the trial court, the People do not bring Aguilar to retrial on the charged offense within the time limit of section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of the lesser included offense of attempted criminal threat and shall resentence Aguilar accordingly.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.