Filed 5/23/24  P. v. Aguilera CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSCAR AGUILERA,<br><br>    Defendant and Appellant. | B325498<br><br>(Los Angeles County<br>Super. Ct. No. LA070638) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Vacated in part and affirmed in part.

Eileen Manning-Villar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

In January 2012, after a gang confrontation, defendant Oscar Aguilera shot and killed rival gang member Samuel Guerra. In 2017, a jury convicted defendant of first degree murder and of being a felon in possession of a firearm. The jury found true the gang and firearm enhancements.

This is defendant's second appeal. He argues, respondent concedes, and we agree that based on legislation subsequent to his trial, the gang enhancements connected to both counts must be reversed. Defendant also argues he is entitled to a new trial on the murder count because the gang enhancements were tried jointly with the murder count. We disagree. Even assuming retroactivity of Penal Code[1] section 1109, which requires if requested, bifurcated trials of gang enhancements and the underlying charged crimes, defendant was not prejudiced by the joint trial of the gang enhancements and murder count under either the federal or state standard of prejudice.[2] Finally, defendant argues the trial court abused its discretion in refusing to strike or reduce the firearm enhancement attached to the murder count because the court did not properly consider mitigating circumstances under posttrial amendments to section 1385.[3] This argument fails because defendant has not shown a mitigating circumstance described in these amendments. We reverse the gang enhancements and otherwise affirm the judgment.

---

[1] Undesignated statutory citations are to the Penal Code.

[2] See Discussion, part B, *post*.

[3] See Discussion, part C, *post*.

## PROCEDURAL BACKGROUND

Defendant was jointly tried with Jeffrey Martinez. The jury convicted defendant of first degree murder of Guerra and found a gang enhancement true. The jury also found true that defendant personally and intentionally discharged a firearm causing Guerra's death. The jury found defendant guilty of being a felon in possession of a firearm and found true the gang enhancement attached to that offense. The jury acquitted Martinez.

The court sentenced defendant to 50 years to life on the murder count but stayed the three-year sentence for the possession count and four-year gang enhancement sentence on that count. The murder sentence consisted of 25 years to life for the murder and an additional 25 years for the firearm enhancement. The gang enhancement did not augment defendant's murder sentence.

In his prior appeal in 2019, we rejected defendant's argument there was no evidence he was a felon; defendant admitted that fact. We also found substantial evidence supported the gang enhancement in effect at that time; the definition of gang enhancement has since been modified. We remanded the case to the trial court to exercise its discretion pursuant to the then newly enacted section 12022.53 to decide whether to strike the firearm enhancement and to conduct a youth offender parole hearing pursuant to the then newly enacted section 3051, subdivision (a)(1). (*People v. Aguilera* (Feb. 26, 2019, B282381) [nonpub. opn.].)

Upon remand, defendant filed a motion for resentencing and presented additional evidence (described in our Discussion) in support of his request that the trial court strike or reduce the

firearm enhancement and resentence him accordingly.  After a
hearing, the trial court denied defendant's motion.

## FACTUAL BACKGROUND[4]

1.    *The murder*

Defendant describes the murder as follows:  After his
confederates announced they were from the Vineland Boyz gang
[Vineland] they "surrounded" Guerra "demanding to know where
he was from."  "After Guerra responded that he was from MS [a
rival gang], appellant walk[ed] over to a grey car, walk[ed] back
to where Guerra was standing and sho[t] him in the head.
[Citations.]  When Guerra fell to the ground, appellant shot him
several more times."

Defendant's description of the murder is supported by the
record.  Guerra's girlfriend testified she was with Guerra outside
a nightclub.  Martinez approached her and asked for a cigarette.
Four males, including defendant, were together.  Martinez and
another male made signs indicating their Vineland membership.
Martinez asked Guerra where he was from, meaning whether he
was "gang-related."  After Guerra identified himself as MS
(La Mara Salvatrucha gang), defendant shot him multiple times.
On the night of the incident, Guerra's girlfriend told a police
officer that three or four males surrounded Guerra's truck and
one made a gesture indicating he was from Vineland gang.  She
told the officer that after Guerra fell to the ground, the shooter
shot two or three more times.

Guerra died of multiple gunshot wounds.

---

[4] We summarize only the facts and procedural history
relevant to the current appeal.

4

Prosecution witness David Fonseca (a Vineland gang member), testified that when interviewed in February 2012, he reported he saw defendant dismantle a gun; thereafter, defendant fled to Mexico.[5]  From Mexico, defendant asked Fonseca if "the heat was away already" so he could return from Mexico.  Defendant told Fonseca to exercise his Fifth Amendment right to refuse to testify.

### 2.    *Gang evidence*

Officer Henry Garay testified as a gang expert.  Garay opined defendant was a Vineland member.  Defendant had a gang tattoo on his back, wrist, arm, leg, and face.  Officer Garay further opined Fonseca and Martinez were Vineland gang members and noted Martinez had admitted his gang membership.

Garay testified Vineland had between 300 and 450 members.  Garay stated Vineland members wrote graffiti, committed vandalism, carjacking, robberies, and attempted murder, as well as the murder of a police officer.  According to Garay, Vineland members often used firearms in committing these crimes.  Garay also testified Vineland member Jose Guttierez committed a carjacking in 2010.  A detective testified that Vineland member Juan Huezo committed murder in 2009.

When asked about the significance of territory to gangs, Garay testified that gangs use territory as their place for selling narcotics and committing other crimes.  Garay testified the

---

[5]  During cross-examination, Fonseca testified he did not see defendant dismantle the gun but was told defendant dismantled the gun.

nightclub where Guerra was shot was located in territory claimed by Vineland.

Garay further opined gang members enhance respect within the gang by committing crimes. Gang signs and tattoos identify a person's gang. The question "where are you from" asks about a person's gang membership. Asking that question often leads to an altercation involving firearms. Garay testified Vineland and MS are rival gangs except inside prison where they were aligned.

When asked a hypothetical question based on the facts of this case, Garay opined the murder was committed for the benefit of, or in association with, a criminal street gang. Garay also testified the gang benefits because it continues a "pattern of fear" instilled in the community and other gang members. Garay testified that Vineland would "look weak" if a member would not respond to the "where are you from" challenge after the questioner identified himself as a rival gang member.

During cross-examination by defendant's attorney, Garay testified he personally investigated about 20 to 25 cases annually involving Vineland members.

During cross-examination by Martinez's attorney, Garay confirmed Vineland was a large gang with about 500 members. Garay confirmed he investigated approximately 25 crimes in the prior year committed by Vineland gang members. Garay testified not all these crimes involved murder; to the contrary, "[v]ery few" cases involved murder.

During redirect, Officer Garay stated the question, "Where are you from?" often results in gang violence, possibly murder. During recross-examination, Martinez's attorney asked Garay how many murders were included in last year's 25 cases; Garay

testified only an attempted murder. Garay further testified that a fist fight is more likely the product of a "where are you from" inquiry than a murder.

Contrary to defendant's assertion on appeal, the court ruled Fonseca could not testify as a gang expert. The court allowed him to testify about the structure and role of gangs. Fonseca testified the defendant's chin tattoo indicates being a "frontline soldier." During cross-examination by Martinez's counsel, Fonseca also described Vineland as a large gang. During redirect, Fonseca testified he did not want to be a "snitch" because snitches get beaten up.

### 3.    *Closing argument*

Defendant's counsel argued the prosecution did not "meet his burden." Counsel questioned Guerra's girlfriend's eyewitness identification. Counsel contended the gang evidence was to "scare the crap out of everybody," but co-counsel "did a very good job at pointing something out. Hundreds, thousands of these hit-ups that they call, 'Where you from?'" do not result in a murder. Defendant's counsel emphasized Garay's testimony that of the 25 gang cases he investigated in the last year, none was a murder. Counsel argued the prosecution wanted to "get gang members" and that "they're . . . asking you to judge them because of their characters, not because of what they did." Counsel argued that there was a reasonable doubt that defendant pulled the trigger.

Among other things, the prosecutor countered: "You know, defense counsel for Mr. Martinez brought up the fact that Mr. Martinez has a job. And I'm sure alone, one to one, personally, may be a very nice guy, may be a hardworking person. You heard evidence also that Mr. Aguilera [defendant]

7

also had a job.  One on one, they may be fine people.  [¶]  The question is:  What happens when they get together?  What happens when these Vineland gang members come together?  Something else happens.  They try to out-macho each other.  They kind of feed on each other.  They support each other.  That's why you need a gang of more than one.  When they get together, they start puffing out each other's chest.  They get bigger, bigger, bigger.  They become more arrogant.  They start throwing their signs, calling out their gang.  Telling the MS gang member:  Who's this 17-year-old little kid?  Get out of our territory.  This is Vineland.  Where are you from?  [¶]  The one nice guy becomes four thugs, four bullies.  They become something else.  And they become the murderous men that you see today."

## DISCUSSION

**A.  The Gang Enhancements on Both Counts Must Be Vacated Because There Was No Evidence That the Gang Benefited From the Predicate Offenses Beyond in Reputation or of Any Link Between the Predicate Offenses and the Gang as an Organized Collective Enterprise**

Section 186.22 permits a gang enhancement if, among other criteria, the prosecution proves the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*).)  Effective January 1, 2022, the Legislature amended section 186.22 to redefine "criminal street

8

gang"[6] and a "pattern of criminal gang activity."[7] (*People v. Clark* (2024) 15 Cal.5th 743, 749 (*Clark*).)  One change altered the requirements for proving a predicate offense, a prerequisite to establishing the existence of a criminal street gang.  (*Id.* at p. 749.)  "As amended by Assembly Bill 333,[8] section 186.22 defines the term ' "criminal street gang" ' to mean 'an ongoing, organized association or group of three or more persons, . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity.'  (§ 186.22, subd. (f), italics added.)"  (*Clark*, at p. 749.)

---

[6] Section 186.22, subdivision (f) provides:  " 'criminal street gang' means an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity."

[7] Section 186.22, subdivision (e)(1) provides in part:  " '[P]attern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational . . . ."

[8] Assembly Bill No. 333 (2021–2022 Reg. Sess.) was signed into law in 2021 (see Stats. 2021, ch. 699, § 3).

The amended statute defines the " ' "pattern of criminal gang activity," ' in turn, to mean, in pertinent part, the commission of (or other specified forms of involvement in) two offenses enumerated in the statute, 'provided . . . [they] were committed on separate occasions or by two or more members' of the gang and the offenses provided a benefit to the gang that is more than reputational." (*Clark*, *supra*, 15 Cal.5th at p. 749, italics omitted.) The statute as revised after defendant's trial requires a "showing that links the two predicate offenses to the gang as an organized collective enterprise." (*Id.* at p. 761; see *id.* at p. 749 ["This organizational nexus requirement is satisfied by showing a connection between the predicate offenses and the organizational structure, primary activities, or common goals and principles of the gang."].)

The amendments to the definitions in the gang enhancement are retroactive. (*Clark*, *supra*, 15 Cal.5th at p. 753; *Tran*, *supra*, 13 Cal.5th at p. 1207.) The record reveals no evidence (1) the predicate offenses—Huezo's murder and Gutierrez's carjacking—benefited the gang in a manner that was more than reputational; or (2) of any link between those offenses and the gang as an organized collective enterprise. (*Clark*, at p. 761 ["The change was made in service of the Legislature's broader goal of differentiating between the threat posed by organized groups collectively engaged in criminal activity, versus the threat posed by individual, loosely connected persons who happen to commit crimes. That differentiation, we now conclude, requires a showing that links the two predicate offenses to the gang as an organized, collective enterprise."]; see *People v. E.H.* (2022) 75 Cal.App.5th 467, 479, 481 [reversing gang enhancements where prosecution did not show new element that

predicate offenses provided more than reputational benefit to gang].)  Upon remand the People may elect to retry the gang enhancements.[9]  (*Clark*, at pp. 764–765.)

## B.     Assuming Section 1109 Is Retroactive, the Alleged Error In Failing To Bifurcate Trial of the Gang Enhancements Was Not Prejudicial Under Either the State or Federal Standard of Prejudice

Defendant argues he is entitled to a new trial on the murder count because the trial court jointly tried that count with trial of the gang enhancements.  Section 1109, enacted after defendant's trial, requires, if requested, bifurcation of trial of gang enhancements and underlying offenses.[10]  (*Tran*, *supra*,

_____

[9] Because we vacate the gang enhancements, we do not address defendant's arguments that other prerequisites under the amended statute were not satisfied.

[10] Section 1109 provides:  "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1)  The question of the defendant's guilt of the underlying offense shall be first determined.

"(2)  If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement.  Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist

11

13 Cal.5th at p. 1208.)  We assume for purposes of this appeal, defendant did not forfeit this challenge notwithstanding he did not request bifurcation of the gang enhancement at trial and did not request it on remand from the first appeal.

We assume arguendo that section 1109 is retroactive, an issue currently pending in the Supreme Court.  (See *Tran*, *supra*, 13 Cal.5th at p. 1208; *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.)  Notwithstanding these favorable assumptions, defendant has failed to show prejudice from any error in failing to bifurcate trial of the gang enhancements.

Contrary to defendant's argument, failure to bifurcate trial of a gang enhancement is not structural error.  (*Tran*, *supra*, 13 Cal.5th at p. 1208.)  As for prejudice, defendant appears to concede some gang evidence would have been admissible even in a bifurcated murder trial because it was probative of motive when he argues on appeal, "[w]hile some gang evidence might be allowed in as evidence of motive even in a bifurcated trial, it is inconceivable that . . . anything like the evidence here would be admitted."

The thrust of defendant's prejudice argument is that the gang evidence constituted "propensity evidence that suggests to

---

in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

"(b)  If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

12

the jury that if you are a member of a gang, you are very likely to commit crimes like the one of which you are accused." Defendant cites Garay's testimony in asserting it "suggest[ed] to the jury that if you are a member of a gang, you are very likely to commit crimes like the one of which you are accused." Defendant further argues the gang evidence allowed the prosecutor to argue defendant and his fellow gang members "feed on each other" and "support each other" leading them to "become the murderous men that you see today."

We conclude the purported error in failing to bifurcate trial of the gang enhancements was harmless under either *Chapman* (*Chapman v. California* (1967) 386 U.S. 18) or *Watson* (*People v. Watson* (1956) 46 Cal.2d 818). First, the trial court instructed the jury: "You may not conclude from this evidence [of gang activity] that the defendant or any defendant is a person of bad character, that he has a disposition to commit crime."[11] The court's instruction, which we must presume the jury followed (*People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014), indicates the jury could not have convicted defendant based merely on gang membership or any propensity to commit crimes.

Second, the jury's acquittal of co-defendant Martinez, despite evidence that he too was a Vineland member and that his trial included the same gang evidence, provides further support that neither the gang evidence nor the prosecutor's argument

---

[11] When Officer Garay testified about the crimes, the court told the jury: "A criminal street gang has a legal technical definition. In order to satisfy that legal technical definition, the prosecution gets to ask about other crimes committed allegedly by the same gang. All right. So this is going to the legal definition of what's a criminal street gang."

13

motivated the jury to convict defendant.  Finally, the jury deliberated for less than one day with respect to both defendants, which suggests, contrary to defendant's characterization of the evidence, that the jury did not view the case as close.  (See *People v. Houston* (2005) 130 Cal.App.4th 279, 300 [jury deliberations over four days did not show case was close but instead showed jury's " 'conscientious performance of its civic duty' "]; compare *In re Martin* (1987) 44 Cal.3d 1, 51 [22-hour deliberation supports inference that jury believed case was close].)

## C.    The Trial Court Acted Within its Discretion In Imposing the Firearm Enhancement

Defendant argues the trial court abused its discretion when, on remand, the court reimposed the 50-year-to-life sentence instead of striking or reducing the firearm enhancement and resentencing him.  Specifically, defendant contends there is a reasonable probability the trial court would not have sentenced him to 50 years to life if it had properly understood its discretion under amendments to section 1385, subdivision (c)(2), effective on January 1, 2022—10 months before the hearing on defendant's resentencing motion.  We begin with additional background and then turn to defendant's arguments.

### 1.    Additional Background

Defendant filed a motion for resentencing requesting the trial court to strike or reduce the firearm enhancement. Defendant is correct that neither his trial counsel nor the prosecutor referred the trial court to the new provisions in section 1385.

In support of his motion, defendant attached Dr. Ronette Goodwin's April 14, 2021 report in which Goodwin described

14

defendant's difficult upbringing. Defendant's mother died when he was 12 years old, and defendant described "feeling lost and abandoned after his mother's death." Defendant reported that after his mother's death, his grades declined as did his interest in extracurricular activities. Defendant told Goodwin he joined Vineland at age 14, when he also dropped out of school and began abusing cocaine and methamphetamine. Defendant reported that before his mother's death, his father hit him with belts and cables, but his father stopped after defendant's mother died. Defendant stated he was charged with multiple crimes prior to the current offense and served one year in state prison where he was involved with gangs; he " 'wasn't afraid of going back' " to prison.

According to Goodwin, defendant told him that on the day of the incident underlying his convictions, defendant used heroin and felt "challenged" when the victim indicated his MS gang membership. Defendant said he " 'pulled the trigger' because he believed that by 'stepping up' he could gain a respectable name." While in prison, defendant was not active in the gang although he did not "drop[ ] out." Defendant also told Goodwin that in prison, he received his GED and had enrolled in a college program. Goodwin opined defendant's mother's death "impacted his psychological development." Goodwin determined defendant had a moderate to high risk for general recidivism.

A later report by an investigator described communications with defendant's family members. Maternal aunt reported no abuse in defendant's family. According to defendant's aunt, his mother's death affected defendant, but defendant's father "was very caring and took good care of [Defendant] after" his mother's death. Defendant's father reported defendant's family was "close-

15

knit"; there was no abuse in the home. According to defendant's father, defendant stopped attending school when defendant turned 16 and started working. Paternal uncle, who lived with defendant, reported no abuse in the home and indicated defendant had a good relationship with his father after defendant's mother died. Defendant's brother also reported no abuse in the family home.

At a hearing on November 10, 2022, the People opposed striking the firearm enhancement. The People cited the cruel nature of the murder, which was committed at close range on an unarmed victim. At the hearing, defendant denied he was the shooter, and emphasized his difficulties after his mother died. Defendant also argued he "changed" during his incarceration.

The parties discussed when defendant would be eligible for parole and the court noted his eligibility would be the same regardless of whether the court struck or imposed the firearm enhancement.

The court explained it was mindful of defendant's mother's death, as well as his efforts to educate himself while incarcerated. The court described defendant's childhood as a "mixed bag," "wasn't bad. Wasn't good." The court explained, "[The] bottom line is this; . . . the crime was extremely callous."

### 2. Analysis

We review the trial court's decision not to strike or reduce the firearm enhancement for abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.) Defendant argues the trial court did not understand the boundaries of its discretion in recent amendments to section 1385, and thus abused that discretion when it refused to strike or reduce the 25-year firearm enhancement. Given the centrality of these amendments to

16

defendant's argument, we set forth below the pertinent provisions of amended section 1385.

Section 1385, subdivision (c)(1) provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." The statute dictates in subsection (c)(2): *"In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.* Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (Italics added.)

The mitigating factors referenced in section 1385, subdivision (c)(2) are:

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed.

"(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed.

"(D) The current offense is connected to mental illness.

*"(E) The current offense is connected to prior victimization or childhood trauma.*

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded." (Italics added.)

Finally, section 1385, subdivision (c )(6)(A) defines " '[c]hildhood trauma' " as "physical, emotional, or sexual abuse, physical or emotional neglect" experienced by a minor. The same subsection lists what evidence would demonstrate such trauma: "A court may conclude that a defendant's childhood trauma was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, medical records, or records or reports by qualified medical experts, the court concludes that the defendant's childhood trauma substantially contributed to the defendant's involvement in the commission of the offense."

In his opening brief, defendant relies on the following mitigating factors: discriminatory racial impact (§ 1385, subd. (c)(2)(A)), multiple enhancements (*id.*, subd. (c)(2)(B)), and childhood trauma (*id.*, subd. (c)(2)(E)). In his reply brief, he limits his argument to the childhood trauma mitigating factor. We observe defendant provided no evidence of discriminatory racial impact, and although the jury found true the gang and firearm enhancements, the gang enhancement did not increase

18

defendant's sentence and must be reversed for the reasons set forth in the preceding section of our Discussion.

Defendant asserts, "[T]he crime was connected to prior victimization or childhood trauma— is, without question, present in this case." He identifies the childhood trauma as "death of his mother, lack of education, alienation from family home, gang ties" and his addictions to various substances. Defendant assumes these are mitigating circumstances without identifying evidence that the alleged "trauma[s]" constituted "physical, emotional, or sexual abuse, physical or emotional neglect." Defendant fails to identify any records or reports showing abuse or neglect that "substantially contributed to the defendant's involvement in the commission of the offense." (§ 1385, subd. (6)(A).) Defendant further ignores the trial court's finding that his childhood was "not good" and "not bad," a finding supported by evidence that notwithstanding defendant's mother's death, his remaining close-knit family cared for him. He thus fails to demonstrate the mitigating circumstance of childhood trauma on which he relies.

We recognize our Supreme Court currently is considering whether section 1385, subdivision (c) creates a rebuttal presumption in favor of dismissing an enhancement where mitigating circumstances exist.[12] We need not consider whether

---

[12] (See *People v. Anderson* (2023) 88 Cal.App.5th 233, review granted Apr. 19, 2023, S278786; *People v. Walker* (2022) 86 Cal.App.5th 386, review granted Mar. 22, 2023, S278309.) *Walker* involves the following issue: "Does the amendment to Penal Code section 1385, subdivision (c) that requires trial courts to 'afford great weight' to enumerated mitigating circumstances (Stats. 2021, ch. 721) create a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds dismissal

there is such a presumption because defendant has failed to demonstrate any mitigating circumstance.[13]  Because defendant identified no such circumstance, the trial court was not required to consider whether defendant posed a danger to public safety.

Finally, defendant argues that the fact the timing of his parole eligibility is the same regardless of whether the firearm enhancement is stricken does not "justify" the trial court's decision to impose the enhancement.  According to defendant, although the enhancement may currently not affect his parole eligibility, in the future, the Legislature could modify the Penal Code.  Defendant's argument does not assist him because he fails to identify a mitigating circumstance supported by evidence.  For that reason, the trial court acted within its discretion in imposing the firearm enhancement.  Put differently, there is no error regardless of whether the firearm enhancement ultimately could affect defendant's parole eligibility.[14]

---

would endanger public safety?"  (Supreme Ct. Mins., Mar. 22, 2023.)

[13]  We observe, as does defendant, that the trial court did not analyze, or make any findings as to whether defendant posed a danger to public safety.  Any such failure does not mask the fatal flaw in defendant's argument, that is, he did not demonstrate any mitigating circumstance to be evaluated against danger to public safety.

[14]  Defendant contends if we conclude he forfeited his challenges to the gang enhancements and murder conviction, then his counsel rendered ineffective assistance of counsel.  He similarly argues that if we conclude his challenge to the trial court's refusal to strike or reduce the firearm enhancement is forfeited, then he received ineffective assistance of counsel.

# DISPOSITION

We vacate the gang enhancements attached to the murder and felon in possession of firearm conviction.  We affirm the judgment in all other respects.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

Because we have addressed these challenges on their merits, we do not address his claims of ineffective assistance of counsel.